[Nos. 45750-6, 46396-4. En Banc. June 17, 1982.]

THE STATE OF WASHINGTON, *Respondent,* v. HENRY GRISBY, JR., *Appellant.*

THE STATE OF WASHINGTON, *Respondent,* v. RAYMOND FRAZIER, *Appellant.*

*Michael A. Frost* and *Bruce D. MacLean,* for appellant Grisby.

*John S. Strait,* for appellant Frazier.

*Norm Maleng, Prosecuting Attorney, J. Robin Hunt, Senior Deputy,* and *Marc A. Boman, Deputy,* for respondent.

DOLLIVER, J.—Defendants Raymond Frazier and Henry Grisby were each convicted on five counts of aggravated murder in the first degree and one count of assault in the

first degree. In the separate penalty phase of the trial they were sentenced to life imprisonment without the right to parole. The State had asked for the death penalty.

A series of events which began on March 1, 1978, ended the next morning with the deaths of three adults and two children, and the wounding of two adults including defendant Grisby.

On the evening of March 1, defendant Frazier went to the apartment of Michael Walker to purchase some heroin. Upon returning to his apartment and administering the drug to himself, Frazier became extremely ill. Several times during the evening and early the next morning Frazier returned to the Walker apartment to complain about the "bad drugs". Finally, Frazier returned with Grisby to Walker's apartment; they were armed with two weapons, a .32 caliber pistol and a .38 caliber pistol. An argument ensued and Frazier, as he admitted, opened fire on the occupants of the apartment, also wounding Grisby.

At this point there is a difference in the stories of the two defendants. Frazier claims that after he emptied the gun he dropped it and fled from the premises. Grisby, however, maintains that when the shots were fired he left the apartment and then discovered that he also was hit. He further claims that he was unarmed and never fired a shot.

The next day, March 3, defendant Grisby was arrested in Seattle. Frazier fled to Kennewick and was arrested the next day. The following day Frazier was transported back to Seattle by two Seattle police officers.

On direct appeal to this court, defendants claim error on the part of the trial court and between them raise eight issues.

It should be noted that the statute discussed herein relative to the death penalty, RCW 9A.32.040, while in effect at all times pertinent to this case, has been substantially amended since. See Laws of 1981, ch. 136, § 55, p. 494; Laws of 1981, ch. 138, § 21, p. 545. RCW 10.94.020 has been repealed. Laws of 1981, ch. 138, § 24(16), p. 546.

I

A. Frazier and Grisby contend the provisions of RCW 9A.32.040 which they state require the "mandatory imposition of life imprisonment without possibility of parole [and] without consideration of mitigating circumstances" constitutes cruel and unusual punishment under the Eighth Amendment and Const. art. 1, § 14. They assert that the court must "allow the particularized consideration of relevant aspects of the character and record of each convicted Defendant before the imposition" of the life imprisonment without possibility of parole sentence, as is required before imposing the death penalty. *Woodson v. North Carolina,* 428 U.S. 280, 304, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976) (plurality decision); *Roberts v. Louisiana,* 428 U.S. 325, 49 L. Ed. 2d 974, 96 S. Ct. 3001 (1976).

We are not persuaded by this argument. The statutes provide for the death penalty (RCW 9A.32.040(1)) (held unconstitutional in *State v. Frampton,* 95 Wn.2d 469, 627 P.2d 922 (1981)), life imprisonment without possibility of release or parole (RCW 9A.32.040(2)), and life imprisonment (RCW 9A.32.040(3)). *See also* RCW 10.94.020. During the special sentencing procedure when the death penalty is sought (RCW 10.94.020), the issue of mitigating circumstances is before the jury. One of the requirements before the death penalty can be imposed is that the jury be "unanimously convinced beyond a reasonable doubt there are not sufficient mitigating circumstances [*see* former RCW 9A.32.045(2)] to merit leniency." RCW 10.94.020(8).

If the jury "finds there are one or more aggravating circumstances but fails to be convinced beyond a reasonable doubt there are not sufficient mitigating circumstances to merit leniency" (RCW 10.94.020(9)), the determination as to mitigating circumstances, as defendants correctly point out, serves only to reduce the penalty from death to life without possibility of release or parole. The jury may not, once it finds an aggravating circumstance, reduce life imprisonment without possibility of release or parole to life imprisonment by finding there were mitigating circum-

stances.

This statutory scheme, however, does not make life imprisonment without the possibility of release or parole cruel and unusual punishment. The cases cited by defendants all concern the death penalty. There is no analogy between the death penalty and life imprisonment without parole. As the Supreme Court has observed, "the penalty of death is qualitatively different from a sentence of imprisonment, *however long.*" (Italics ours.) *Woodson,* at 305. Where aggravating circumstances are found by the jury it does not violate the Eighth Amendment or Const. art. 1, § 14, to sentence to life imprisonment without possibility of release or parole without further consideration of mitigating circumstances. No error was committed.

B

■ Defendants argue Laws of 1977, 1st Ex. Sess., ch. 206, p. 774, "An Act Relating to the death penalty . . ." violates Const. art. 2, § 19: "No bill shall embrace more than one subject, and that shall be expressed in the title." Specifically, defendants complain that section 8, which deals with the matter of legal costs when a person raises a "substantial question of self–defense" is a separate subject. We have held Const. art. 2, § 19, should be liberally construed so as to sustain the validity of a legislative enactment. *Water Dist. 105 v. State,* 79 Wn.2d 337, 485 P.2d 66 (1971). As we noted in *Kueckelhan v. Federal Old Line Ins. Co.,* 69 Wn.2d 392, 403, 418 P.2d 443 (1966):

> So long as the title embraces a general subject, it is not violative of the constitution even though the general subject contains several incidental subjects or subdivisions. . . . All that is required is that there be some "rational unity" between the general subject and the incidental subdivisions. If this nexus can be found, the act will survive the light of constitutional inspection.

(Citations omitted.)

■ The primary subject of the legislation is the death penalty. Under section 8, even a multiple homicide committed in self–defense would not be punishable by the

death penalty and a person wrongly accused might be entitled to reimbursement for expenses involved in the legal defense. This is sufficient to meet the test of "rational unity." The statute does not violate Const. art. 2, § 19.

## C

Defendant Frazier alleges violation of due process and a fair trial in that Grisby's counsel in his opening statement made the statement he would offer the testimony of a witness whom he later failed to produce. The circumstance was that in the opening statement it was said that Grisby would call a witness who would testify Frazier said several years ago that if he were ever involved in a homicide he would kill all witnesses. The witness was not called. The reason given by counsel for defendant was that he believed the testimony of the witness "was not as forthright as we would care to produce on proof of any fact."

■■ Counsel may anticipate testimony in opening argument as long as there is a good faith belief that the testimony will be produced at trial. *Frazier v. Cupp,* 394 U.S. 731, 22 L. Ed. 2d 684, 89 S. Ct. 1420 (1969). Here there was no allegation at trial of bad faith and the court specifically accepted the statement of Grisby's counsel as to why the witness was not called. Furthermore, the trial court instructed the jurors that an opening statement is not evidence and cannot be considered as evidence by them. The jury is presumed to follow the instructions of the court. *State v. Kroll,* 87 Wn.2d 829, 558 P.2d 173 (1976). There was no error.

## D

In the penalty phase of the case, the court instructed the jury that the statutory mandatory minimum for life imprisonment with possibility of parole is 13 years 4 months. Defendants claim this is an erroneous definition of life imprisonment. It is, however, an exact statement of the statutory minimum time which must be served for a life sentence. RCW 9.95.070, .110, .115. Not only is the definition not erroneous, but the trial court also carefully instructed the jury so as to insure no undue emphasis would be placed on any instruction.

Defendants further contend that the instruction caused

the jury to place undue reliance on the relatively short prison term specified in the statutory definition and thus select a harsher penalty. In support of this contention, defendants rely upon *State v. Todd,* 78 Wn.2d 362, 474 P.2d 542 (1970). In *Todd,* a capital case brought under a statute not now in effect, the sole sentencing function of the jury was to recommend whether defendant would be hanged. The court held that where the jury had no notion of how much time, if any, the defendant would serve if he were not sentenced to death, the trial court had a duty to inform the jury that the defendant, if not given death, would receive a life sentence. It was further held the defendant would serve such portion of that life sentence as the Parole Board determined. *Todd,* at 374–75.

In this case, however, the sentencing powers of the jury have been broadened by the new statute to determine whether the defendant should receive death, life imprisonment without parole, or life imprisonment with parole. RCW 9A.32.040(1), (2), (3). The first two choices are self–explanatory, but the last choice cannot be understood by the jury without definition by the trial court. The trial court had a duty to instruct the jury what that mandatory minimum was so that they could make an informed decision. In doing so, the trial court acted in accordance with the directive in *Todd* that the jury be instructed so as to be capable of rendering an informed sentencing decision. *Todd,* at 376. No error was committed in the penalty phase instructions.

## II

A. Defendants contend Laws of 1977, ch. 206, § (4)(1)(f), p. 776, RCW 9A.32.045(1)(f) is unconstitutionally vague in that it fails to give reasonable notice of the prohibited conduct to those who wish to avoid its penalties and to provide a precise standard to guide the judge and jury. The statute reads:

(1) In a special sentencing proceeding under RCW 10.94.020, the following shall constitute aggravating circumstances:

. . .

(f) There was more than one victim and the said murders were part of a common scheme or plan, or the result

of a single act of the defendant.

After the jury had retired following the sentencing proceeding, it asked the court for clarification as to whether the term

> *common* [applied] to a common scheme between the defendants or a common scheme of murders, i.e., were the *defendants* in common or were the *victims* the common factor.

In response to the query, the trial court responded:

> "Common scheme or plan" refers to victims rather than the defendants. However, you must answer this question unanimously as to each defendant individually.

 Due process is violated when the statute is so ambiguous it fails to make clear to a person of common intelligence what conduct is forbidden. Thus "a penal statute or ordinance must contain ascertainable standards of guilt, so that men of reasonable understanding are not required to guess at the meaning of the enactment." *Bellevue v. Miller,* 85 Wn.2d 539, 543, 536 P.2d 603 (1975), citing *Seattle v. Drew,* 70 Wn.2d 405, 408, 423 P.2d 522, 25 A.L.R.3d 827 (1967). We think the impact of the statute can be understood by an average person. There is a maxim that penal statutes must be strictly construed but, as observed by the United States Supreme Court, this maxim

> is not an inexorable command to override common sense and evident statutory purpose. It does not require magnified emphasis upon a single ambiguous word in order to give it a meaning contradictory to the fair import of the whole remaining language.

*United States v. Brown,* 333 U.S. 18, 25–26, 92 L. Ed. 442, 68 S. Ct. 376 (1948).

Defendants engage in an extended discussion of the fact that the phrase "common scheme" is utilized in several areas of the law and that it may be defined in more than one way. While this may be so, our only interest here is whether the term is vague in the context of the statute in which it is incorporated. *State v. Foster,* 91 Wn.2d 466, 589 P.2d 789 (1979). The trial court correctly advised the jury that the "common scheme or plan" involves a nexus between the killings and not the killers. *See Sheriff,*

*Washoe Cy. v. Smith,* 91 Nev. 729, 542 P.2d 440 (1975). With this instruction, the trial court removed any question as to the meaning of the language or the understanding of the language by the jury. The statute is not void for vagueness.

B

■ Defendant Grisby raises the question of whether the opinions of polygraph examiners regarding the truthfulness of Henry Grisby should have been admitted. The State refused to stipulate to their admission. The rule in Washington is that the results of a polygraph examination are inadmissible absent a stipulation. *State v. Descoteaux,* 94 Wn.2d 31, 614 P.2d 179 (1980). *See State v. Renfro,* 96 Wn.2d 902, 639 P.2d 737 (1982). In *State v. Woo,* 84 Wn.2d 472, 475, 527 P.2d 271 (1974), the court stated that if it were "furnished with a record sufficiently adequate to permit review of the subject", it might consider a departure from the rule against admissibility of polygraph examinations. Grisby claims such a record has been presented in this case. We disagree.

The same problem exists in this case as in *Woo* and in *State v. Young,* 87 Wn.2d 129, 550 P.2d 1 (1976). As we said in *Woo,* at 474–75:

> There is nothing to disclose whether there exists even minimum accepted qualifications for polygraph operators. If standards do exist, one is left to speculate as to what they are. There is nothing in the records, by way of testimony or exhibit, concerning the trustworthiness of the most modern polygraph equipment. The type of equipment proposed to be used in the instant cases and its reliability are not disclosed. Further, the records are silent as to techniques to be used in the examinations and whether they are professionally acceptable.

Here there was no testimony as to written standards and techniques for polygraph examinations. Washington has no licensing standards or requirements. There is no standard system for the calibration of the equipment nor is there a certification process in the use of calibration equipment.

*Seattle Police Officers' Guild v. Seattle,* 80 Wn.2d 307, 494 P.2d 485 (1972), cited by defendants is not in point. In that case, the Seattle Police Department was investigating

police corruption. As part of the investigation, police officers were required to submit to a polygraph under threat of dismissal if they refused. The police officers were told that the information obtained in the polygraph test could not be used against them in a criminal proceeding. The court held the Seattle Police Department could properly request the officers to take the polygraph test under penalty of dismissal for refusal but that neither the willingness or unwillingness of an officer to take the test nor the results could have independent probative value.

Even though RCW 10.94.020(5) is a relaxed evidentiary rule for death penalty special proceedings, the "relevant evidence" must have "probative value." While we continue to hold to our statement in *State v. Woo, supra,* that we might reconsider the rule against the admissibility of polygraph examinations without a stipulation, the record in this case is not sufficient nor do we believe the trustworthiness of polygraph examinations has been shown. There is no error in failing to admit the examination results.

### III

Defendant Frazier contends statements made by him were elicited by deception and are therefore inadmissible. *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). At issue are two separate statements made under different circumstances:

### A

The initial statement was made after defendant Frazier's arrest in Kennewick. He was taken to the police station where he was read his *Miranda* rights. *Miranda v. Arizona, supra.* After saying he understood those rights he was asked if he wished to make a statement. He declined. At the CrR 3.5 hearing, Detective Reed of the Seattle Police Department testified that at this juncture Frazier said he "felt he should talk to an attorney first." There is no suggestion that at any time during the interrogation Frazier waived his *Miranda* rights. *Cf. Edwards v. Arizona,* 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981). Nonetheless, Detective Reed continued the interrogation and asked if Frazier would be interested in hearing Grisby's statement in which Grisby blamed Frazier for the killings.

The testimony by Detective Reed and Detective Fearing of the Kennewick Police Department is confused as to whether Frazier read the statement (Reed) or it was read to him (Fearing). In any event, after the contents of the Grisby statement were known to Frazier, he still made no statement or comment.

If, rather than saying nothing, Frazier had made a statement immediately after this action, his *Miranda* rights would have been violated since his right to remain silent was not "scrupulously honored." *See Michigan v. Mosley,* 423 U.S. 96, 104, 46 L. Ed. 2d 313, 96 S. Ct. 321 (1975); *Edwards v. Arizona, supra; Rhode Island v. Innis,* 446 U.S. 291, 301, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980). However, the defendant made no statements at this point, but indicated his desire to leave. The interview and the interrogation were over.

As he was leaving, Detective Fearing of the Kennewick Police Department placed some clothing belonging to Frazier as well as a clear plastic bag on the table. The bag contained $173 taken from the arrest scene. To the question as to why he was "obtaining those particular items at that moment?", Detective Fearing responded, "I knew at that time the Seattle Police personnel did not want to take the money back with them, so I was separating it from the other evidence on my desk, preparing the other evidence for them to take back." When he saw the money in the plastic bag, Frazier spontaneously asked where the money had come from and was told. Detective Reed stated Frazier then said:

"That's my money. It's not hot. I didn't steal nothing from that apartment. I shot the people, but I didn't steal nothing. I shot the people, but I didn't steal no drugs or money. The money belongs to me. I feel bad about the kids, but I'm a bad shot. They started it all. They gave me a hot shot. I was sick for three days. They put a gun up to my head and burned some of my money. They had it coming, but I didn't mean to hurt the kids."

The statement was made after the interrogation had been

completed and it was Frazier who asked the question and received an answer. The police did not ask him anything; he simply made the above statement. "[S]ince the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis, supra* at 301–02. *See State v. Braun,* 82 Wn.2d 157, 509 P.2d 742 (1973).

These acts occurred while the police officers were separating the physical evidence after the interrogation had terminated. They were actions completely separate from inquiry on the statement of Grisby and were not meant to elicit a response from Frazier. There is nothing in the record to indicate the police should have known these actions were "reasonably likely" to induce the statement from Frazier. The placing of the bag on the desk and the answer to the question posed by Frazier do not constitute the "functional equivalent" of express questioning which the court in *Innis* deemed a prerequisite to the invocation of the *Miranda* safeguards. The State must prove by a preponderance of evidence that a custodial statement of a defendant is voluntary. *Lego v. Twomey,* 404 U.S. 477, 30 L. Ed. 2d 618, 92 S. Ct. 619 (1972); *State v. Braun, supra.* We hold there is a preponderance of evidence that the statements made by Frazier were voluntary and not induced by the police. His *Miranda* rights were not violated.

### B

The other statements were made by Frazier on his return trip to Seattle. They were the result of Frazier's own volition and were admitted only at the special sentencing proceeding. The record does not reflect nor does the defendant contend that any overt or covert coercion was used to induce the defendant to make the statements. Just as we hold the statements at the Kennewick police station to have been made voluntarily, so do we hold these statements

to have been voluntary. There was no denial of the *Miranda* rights of Frazier.

### IV

Early in the proceedings, the trial court put the State to an election under CrR 4.4(c)(1) between offering statements made by defendants against each other in separate trials or not introducing these statements in a joint trial. The State elected not to use the statements, thus avoiding the problems caused by the rule announced in *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968).

Prior to the adoption of CrR 4.4, the granting of separate trials was at the discretion of the trial court. RCW 10.46-.100; *State v. Davis*, 73 Wn.2d 271, 438 P.2d 185 (1968). CrR 4.4(c)(2), which superseded RCW 10.46.100 and was adopted July 1, 1973, provides:

> The court, on application of the prosecuting attorney, or on application of the defendant other than under subsection (i), should grant a severance of defendants whenever:
> (i) if before trial, it is deemed necessary to protect a defendant's rights to a speedy trial, or it is deemed appropriate to promote a fair determination of the guilt or innocence of a defendant; or
> (ii) if during trial upon consent of the severed defendant, it is deemed necessary to achieve a fair determination of the guilt or innocence of a defendant.

Initially defendants assert that, even though under RCW 10.46.100 the granting of a motion to sever was discretionary, CrR 4.4 sets more stringent standards. Both defendants on several occasions moved for separate trials, alleging mutually antagonistic defenses. They claim the denial of these motions was a manifest abuse of discretion.

We agree with the statement of the Court of Appeals in *State v. Herd*, 14 Wn. App. 959, 963 n.2, 546 P.2d 1222 (1976) that "Separate trials have never been favored in this state. *See State v. Ferguson*, 3 Wn. App. 898, 906, 479 P.2d 114 (1970). Nothing in CrR 4.4(c) has

changed this." Furthermore, we concur that "[t]he granting or denial of a motion for separate trials of jointly charged defendants is entrusted to the sound discretion of the trial court and will not be disturbed on appeal absent a manifest abuse of discretion." *State v. Barry,* 25 Wn. App. 751, 756, 611 P.2d 1262 (1980). It would be burdensome, as a matter of course, "to accommodate separate trials in all cases . . . Separate trials should be required only in those instances in which an out–of–court statement by a codefendant expressly or by direct inference from the statement incriminates his fellow defendant." *State v. Ferguson,* 3 Wn. App. 898, 906, 479 P.2d 114 (1970). The problem with *Ferguson* was inability to cross–examine codefendants, a difficulty not present in this case as both Grisby and Frazier took the stand and testified. Here the incriminating statements of each defendant against the other were excluded because of the problems presented by *Bruton* and *Ferguson.*

The defendants argue that as a matter of law when mutually antagonistic defenses are offered severance must be granted. Even conceding arguendo there were antagonistic defenses, the legal proposition advanced by defendants is not the law of Washington nor is it the law in the majority of jurisdictions. In order to support a finding that the trial court abused its discretion, the defendant must be able to point to specific prejudice. *State v. Kinsey,* 20 Wn. App. 299, 579 P.2d 1347 (1978); *see State v. Barry, supra.*

The federal courts have taken a similar position. The decision as to whether or not to sever is appropriately left to the sound discretion of the trial court. *Opper v. United States,* 348 U.S. 84, 95, 99 L. Ed. 101, 75 S. Ct. 158, 45 A.L.R.2d 1308 (1954). The burden is on the moving party to come forward with sufficient facts to warrant the exercise of discretion in his favor. *See United States v. Finkelstein,* 526 F.2d 517, 523 (2d Cir. 1975), *cert. denied sub nom. Scardino v. United States,* 425 U.S. 960, 48 L. Ed. 2d 205, 96 S. Ct. 1742 (1976). The Ninth Circuit has recently stated "Severance . . . is proper only when the defendant carries the difficult burden of demonstrating undue prejudice

resulting from a joint trial." *United States v. Davis,* 663 F.2d 824, 832 (9th Cir. 1981). One court has stated that in order "to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *United States v. Davis,* 623 F.2d 188, 194–95 (1st Cir. 1980). This is the generally held view in all circuits except the newly created Eleventh Circuit.

The states have taken a similar view. The Montana Supreme Court stated that it must consider (1) speed of the administration of criminal justice; (2) conservation of judicial time; (3) the burden of two trials on jurors; and (4) the necessity of recalling witnesses, and weigh this against potential prejudice. *State v. Strain,* ___ Mont. ___, 618 P.2d 331 (1980). The Kansas court denied severance in a case that included the execution slaying of a police officer while holding antagonistic defenses are perhaps the most compelling ground for severance. *State v. Myrick,* 228 Kan. 406, 616 P.2d 1066 (1980). It refused to reverse even though the defendants were "acting belligerent toward each other and referring to the defendants by various derogatory street names and alluding to the danger of racial classification by the jury." *State v. Myrick, supra* at 416. The court held the trial court did not abuse its discretion; the denial of severance was upheld.

Mutually antagonistic defenses may on occasion be sufficient to support a motion for severance but this is a factual question which must be proved by the defendant. It does not represent sufficient grounds as a matter of law. Furthermore, in this case the defenses do not appear to be inherently antagonistic. Both agree they went to the Walker apartment armed with two pistols to resolve the drug dispute. The sole disagreement is who killed which victims. This conflict is not sufficient to find an abuse of discretion by the trial court for failing to grant a motion to sever. As we said in *State v. Davis, supra* at 290:

The fact that the interests of all the participants in a crime conflict does not require that the court grant each of several participants a separate trial. Such conflicts invariably will be present "where two or more persons are tried for the same crime. . . ." and if such conflicts are "regarded as requiring a separate trial, it is at once plain that the statute is rendered nugatory, and joint trials will be the exception and not the rule. But such was not the intent of the legislature." *State v. Clark,* 156 Wash. 47, 51, 286 Pac. 69 (1930).

*See also State v. Tollett,* 12 Wn. App. 134, 528 P.2d 497 (1974).

Furthermore, the trial court gave appropriate instructions cautioning the jury to scrutinize separately the case of each defendant and not to convict one defendant solely on the testimony of the other unless the jury was convinced beyond a reasonable doubt of the truth of the statement. Jurors are presumed to follow instructions. *State v. Kroll,* 87 Wn.2d 829, 558 P.2d 173 (1976). We agree with the observation made in *State v. Pepoon,* 62 Wash. 635, 644, 114 P. 449 (1911):

In addition, we must indulge some presumptions in favor of the integrity of the jury. It is a branch of the judiciary, and if we assume that jurors are so quickly forgetful of the duties of citizenship as to stand continually ready to violate their oath on the slightest provocation, we must inevitably conclude that a trial by jury is a farce and our government a failure.

Next Grisby contends that if he and Frazier had been tried separately Frazier's wife, Jennifer, could have testified that her husband had done the killing. We disagree. While the statutory spousal competency rule would not have prevented such testimony in a separate trial, the marital privilege rule protecting confidential communications would have done so. RCW 5.60.060(1). *See* 5 R. Meisenholder, Wash. Prac. § 181 (1965). No showing was made by Grisby that Jennifer would have waived the privilege.

Even if, arguendo, the testimony would have been available and admissible, failure to grant Grisby a separate trial and thus admit the testimony would be harmless error.

Jennifer's testimony that her husband called her at work and told her that he had "shot Myra and them" and that he had "shot up everything in the house" is not exculpatory as to Grisby and would have been in no way inconsistent with his participation in the murders.

Finally, Frazier argues the failure of the trial court to sever the penalty phase of the trial denied his constitutional right to confront his accusers. During the penalty phase, Juanita Bell, Grisby's common law wife, testified that Grisby had said "he did not hurt anyone". Under the statute, any evidence which the trial court deems to have probative value must be received regardless of its admissibility under usual rules of evidence, "[p]*rovided,* [t]hat the defendant is accorded a fair opportunity to rebut any hearsay statements". RCW 10.94.020(5). *See Gregg v. Georgia,* 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976). Frazier was not able to cross–examine Grisby because Grisby did not take the stand in this phase, nor did Frazier attempt to cross–examine Ms. Bell.

Frazier cites *Specht v. Patterson,* 386 U.S. 605, 18 L. Ed. 2d 326, 87 S. Ct. 1209 (1967) as upholding his right to cross–examine the witnesses against him. In that case, the court held the accused has a right to due process, which requires the accused "be present with counsel, have an opportunity to be heard, be confronted with witnesses against him, have the right to cross–examine and to offer evidence of his own." *Specht,* at 610. *Specht* was, however, expressly limited in its holding to the granting of a special hearing to a sex offender where he was being sentenced to prison on the basis of a psychiatric report.

*Specht* involved Fourteenth Amendment due process. In the majority opinion, Justice Douglas emphasized that *Specht* did not address any Sixth Amendment confrontation clause issues. The Court noted that the Colorado sentencing procedure involved in *Specht* would have passed constitutional muster if there had been a hearing where defendant was represented by counsel and given the opportunity to present witnesses in his own behalf. As Frazier

did have an opportunity in the penalty hearing in the instant case to present witnesses on his own behalf, the *Specht* safeguards were more than satisfied. Neither *Bruton v. United States, supra,* nor *Pointer v. Texas,* 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065 (1965), involves the penalty phase proceeding in a bifurcated trial.

We find no error and affirm the trial court. As stated by this court in *State v. Schrager,* 74 Wn.2d 75, 82, 442 P.2d 1004 (1968):

> In *State v. Miles,* 73 Wn.2d 67, 70, 436 P.2d 198 (1968), we said that "the final measure of error in a criminal case is not whether a defendant was afforded a perfect trial, but whether he was afforded a fair trial." The defendant had a fair trial and his conviction will stand.

Affirmed.

BRACHTENBACH, C.J., and ROSELLINI, STAFFORD, DORE, and DIMMICK, JJ., concur.

UTTER, J. (dissenting)—I disagree with the majority's disposition of appellant Frazier's claims concerning suppression of certain pretrial statements and appellants Frazier's and Grisby's claims concerning severance of their trials.

I

The majority's conclusion that appellant Frazier's pretrial statements were voluntary and thus admissible conflicts both with common sense and the legal standards for examining the question. Although the crimes alleged are heinous, by failing to apply the relevant United States Supreme Court authority, we mislead conscientious law enforcement agencies that seek guidance from our decisions as to correct standards of conduct.

When appellant Frazier was apprehended, he was taken to the police station in Kennewick where he was read his *Miranda* rights. The majority itself concedes Mr. Frazier not only wished to remain silent, but he invoked his Fifth and Fourteenth Amendments right to have counsel present

during a custodial interrogation.[1] Neither the majority nor Detective Reed even hint that Frazier's request was the least bit equivocal. *Cf. Nash v. Estelle,* 597 F.2d 513 (5th Cir. 1979) (establishing the possibility of waiver other than by communication initiated by the accused if a request for counsel is equivocal).

My dissenting discussion in *State v. Pierce,* 94 Wn.2d 345, 353, 618 P.2d 62 (1980) and the United States Supreme Court's most recent case interpreting *Miranda, Edwards v. Arizona,* 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981), establish the legal framework for determining if Frazier waived his Fifth Amendment right after invoking it. As I stated in *Pierce,* analysis must begin with *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966) itself:

> the United States Supreme Court clearly and expressly declared in *Miranda* that:
>> If the individual states that he wants an attorney, the interrogation *must* cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning.
>
> (Italics mine.) *Miranda,* at 474. On subsequent occasions, the court has repeatedly declared that this language from the *Miranda* decision states the applicable per se rule for assertions of the right to counsel. In *Michigan v. Mosley,* 423 U.S. 96, 101 n.7, 46 L. Ed. 2d 313, 96 S. Ct. 321 (1975), the court quoted the above passage from *Miranda* and explained that it "detailed" the "procedures to be followed if the person in custody asks to consult with a lawyer . . ." *See also Mosley,* at 104 n.10; 109–10 & n.2 (White, J., concurring). In *Fare v. Michael C.,* 442 U.S. 707, 719, 61 L. Ed. 2d 197, 99 S. Ct. 2560 (1979), the court observed that it had "fashioned in *Miranda* the rigid rule that an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requir-

---

[1]Such an invocation of right to counsel during interrogation also implicates a suspect's Sixth Amendment right to counsel. *See Massiah v. United States,* 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199 (1964). *See generally* White, *Rhode Island v. Innis: The Significance of a Suspect's Assertion of His Right to Counsel,* 17 Am. Crim. L. Rev. 53 (1979).

ing that all interrogation cease."

94 Wn.2d at 353 (Utter, J., dissenting).

In *Pierce,* I asserted the majority erroneously

interprets dicta in *Rhode Island v. Innis,* 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980), as signalling the United States Supreme Court's abandonment of the per se rule. However, in *Innis,* the court unambiguously stated that the above quoted passage from *Miranda* "outline[s] in some detail the consequences that would result if a defendant sought to invoke . . . the right to the presence of counsel". *Innis,* 426 U.S. at 297. Although expressly reserving the question of the continued vitality of the per se *Miranda* rule, *Innis,* 426 U.S. at 298 n.2, the *Innis* court did not in any way abolish or diminish this rule.

*Pierce,* at 353–54. The *Edwards* case fully confirms the validity of *Miranda*'s per se .rule, makes the standards in *Pierce*[2] no longer correct constitutional law, is squarely controlling with regard to Frazier's claims, and is merely cited without explanation by the majority.

In *Edwards,* the defendant was arrested on January 19, 1976, and given his *Miranda* warnings. He submitted to initial interrogation before invoking his Fifth Amendment right to counsel. Questioning then ceased until the next day, when officers returned to the jail and gave Edwards his *Miranda* warnings again. Edwards stated he was willing to talk, "but he first wanted to hear the taped statement of

---

[2]In *State v. Pierce,* 94 Wn.2d 345, 352, 618 P.2d 62 (1980), the majority set forth four criteria that must be met before police may question a suspect after the suspect has invoked his or her right to an attorney. These criteria are:
(1) the right to cut off questioning was scrupulously honored, (2) the police engaged in no further words or actions amounting to interrogation before obtaining a valid waiver or assuring the presence of an attorney, (3) the police engaged in no tactics which tended to coerce the suspect to change his mind, and (4) the subsequent waiver was knowing and voluntary.
In light of the holding in *Edwards v. Arizona,* 451 U.S. 477, 485, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981), that an accused may not be interrogated after invoking his right to counsel "unless the accused himself initiates further communication", these criteria may no longer be sufficient. Even if they were sufficient, the majority has not demonstrated and the State has not proved that these criteria have been met in this case.

the alleged accomplice who had implicated him." 451 U.S. at 479. After listening to the tape, Edwards gave a confession that was used against him at trial. The Arizona Supreme Court, much like the majority in this case (see majority opinion, at 505–06), held the admission of Edwards' confession was valid because Edwards had *voluntarily* waived the rights he had invoked on the day before the confession. The United States Supreme Court reversed, holding the Arizona Supreme Court had applied the wrong standard for waiver.

To begin, the State must prove by preponderance of the evidence that a custodial statement of a defendant is voluntary. *State v. Braun,* 82 Wn.2d 157, 162, 509 P.2d 742 (1973); *Lego v. Twomey,* 404 U.S. 477, 30 L. Ed. 2d 618, 92 S. Ct. 619 (1972). The court in *Edwards* then set out the factors the State must prove to establish waiver:

> It is reasonably clear under our cases that waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson* v. *Zerbst,* 304 U. S. 458, 464 (1938).

*Edwards v. Arizona, supra* at 482. Voluntariness is not the sole criterion. Voluntariness and a knowing and intelligent waiver "are discrete inquiries", stated the *Edwards* court at page 484. Having set forth the relevant criteria, the *Edwards* court went on to state its holding:

> [W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police–initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations

with the police.

(Footnote omitted.) *Edwards,* at 484–85.

Without question, the initiation of interrogation by the detectives by asking Frazier whether he would like to read Grisby's statement after Frazier had invoked his right to counsel, which the majority itself concedes was for the purpose of eliciting an incriminating remark from him, violated Frazier's Fifth and Fourteenth Amendments rights. They did not cease interrogation as *Edwards* explicitly requires.

At this point, the majority indulges in a fiction of sorts. After reading Grisby's statement, Frazier indicated only that he desired to leave. The majority deems this the end of the interview, and with its termination whatever constitutional violation that had occurred ends, too. In preparing to leave, Detective Fearing placed a clear plastic bag containing $173 on the table. Frazier then asked where the money had come from, was told, and then made his incriminating statements.

*Edwards* holds, and it cannot be seriously doubted, that a defendant may waive his right to have counsel present after invoking it. But it is important to realize the nature of the right being invoked. Having asked for an attorney, an accused has "expressed his own view that he is not competent to deal with the authorities without legal advice". *Michigan v. Mosley,* 423 U.S. 96, 110 n.2, 46 L. Ed. 2d 313, 96 S. Ct. 321 (1975) (White, J., concurring). Detective Reed took Frazier's request, not as an invocation of a constitutional right, but as a sign of weakness, to be exploited. This is precisely what the constitution is designed to protect against. Detective Reed admitted on examination that he sought to obtain an incriminating response by asking Frazier if he wished to read Grisby's statement. His ploy was successful. Having read Grisby's statement fully inculpating him, Frazier responded with an incriminating statement. Grisby's statement, no doubt, left Frazier with the impression the cat was out of the bag. His remarks concerning the plastic bag were defensive. His words essentially impart:

"You may have me based on Henry's statement, but I didn't rob anyone." How the majority can isolate Frazier's inculpatory remarks from the constitutional violations that prompted them is beyond me. To ignore the effect of a constitutional violation that has just occurred and label Frazier's statements voluntary, knowing and intelligent, as well as initiated by him, is absurd.

In the alternative, to confer causation on Detective Fearing's placement of the plastic bag on the table only continues the majority's artificial line drawing. The plastic bag may have been the precipitating event,[3] but it most certainly was not the cause of Frazier's outburst.

The majority fails to comprehend the meaning of invoking one's right to counsel. When Frazier invoked his right of counsel, he in effect told the officers he was capable of making incriminating statements and that he needed the help of counsel. The detectives exploited Frazier's susceptibility by initiating interrogation after that invocation and were successful in achieving their intended result. To call statements made under these circumstances "voluntary," as well as a "knowing and intelligent relinquishment or abandonment of a known right" is absurd.

It is one thing simply to disagree with the majority about when the interview ended. I do feel it draws the line artificially. But regardless of what I feel, *Edwards* holds and the constitution dictates that we may not impose such an arti-

---

[3] For purposes of the above discussion, I assume that Detective Fearing's placement of the clothing and money on the table did not constitute "interrogation", but I am skeptical that the detective's actions were neutral. The placement of materials on the table soon after contriving to have Frazier read Grisby's statement should be considered part of the "'interrogation environment' created by the interplay of interrogation and custody" that "would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self–incrimination." *Rhode Island v. Innis,* 446 U.S. 291, 299, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980), quoting *Miranda v. Arizona,* 384 U.S. 436, 457–58, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). In the context in which Detective Fearing's actions occurred, the placement on the table of money taken from the scene of the crime might well be viewed as a technique of persuasion that the detectives should have reasonably known might have elicited a response from Frazier. *Innis,* at 301.

ficial barrier. The majority refuses to embark upon *Edwards'* analysis; an analysis that would lead to a result in direct contradiction with the majority's conclusion.

Frazier's statements at the Kennewick police station were obtained in violation of his Fifth and Fourteenth Amendments right to counsel, and should have been suppressed. The numerous statements made by Frazier to the detectives on the trip to Seattle the following day were a direct outgrowth of the initial violation of Frazier's constitutional rights. They all were in response to having heard Grisby's statement, which he would not have heard had his rights not been violated. They, too, should have been suppressed. *Wong Sun v. United States,* 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963); *Sullins v. United States,* 389 F.2d 985 (10th Cir. 1968); *Killough v. United States,* 315 F.2d 241 (D.C. Cir. 1962).

## II

Both Frazier and Grisby moved for separate trials before the trial's inception. Severance prior to trial is controlled by CrR 4.4(c)(2)(i), which states a trial court "should grant" severance "if before trial, it is deemed necessary to protect a defendant's rights to a speedy trial, or it is *deemed appropriate* to *promote* a *fair determination* of the guilt or innocence of a defendant . . ." (Italics mine.) The commentary to the former *ABA Standards Relating to Joinder and Severance,* upon which CrR 4.4 is based, stated: "it has long been the view that defendants joined for trial should be granted a severance whenever their defenses are antagonistic to each other." Std. 2.3(b), Commentary at 41 (Approved Draft, 1968). The new standards continue to identify the importance of severance where "the defendants may have inconsistent or antagonistic defenses". 2 American Bar Ass'n, *Standards for Criminal Justice,* Std. 13-3.2(c) (2d ed. 1980), citing *State v. Holup,* 167 Conn. 240, 355 A.2d 119 (1974) and *Murray v. State,* 528 P.2d 739 (Okla. Crim. App. 1974).

While our rule does not parallel exactly the ABA rule, if anything, it establishes a more liberal standard for sever-

ance: courts should grant severance if "it is deemed appropriate to promote a fair determination". The language of the rule indicates the defendant has the burden of showing prejudice only to the extent of demonstrating severance would promote "a fair determination".

The majority cites *State v. Herd*, 14 Wn. App. 959, 963 n.2, 546 P.2d 1222 (1976) for the proposition "'[s]eparate trials have never been favored in this state. *See State v. Ferguson*, 3 Wn. App. 898, 906, 479 P.2d 114 (1970). Nothing in CrR 4.4(c) has changed this.'" Majority opinion, at 506–07. If all that is meant by this is the economy of a single trial is to be preferred if no other factors are relevant, I cannot disagree. Certainly a defendant may not invoke severance as of right; nor may he obtain severance by a mere allegation of antagonistic defenses. He must articulate a justification for severance. But our rule, derived from the ABA standards, indicates what sort of justifications outweigh concerns for economy. When a defendant presents evidence that severance would promote fairness, such concerns should take precedence over those of judicial economy. Frazier and Grisby presented such fairness concerns in this case.

Turning to the facts, I find I must disagree with the majority's representation of them. The majority claims "the defenses do not appear to be inherently antagonistic. Both agree they went to the Walker apartment armed with two pistols to resolve the drug dispute. The sole disagreement is who killed which victims." Majority opinion, at 508. The majority's characterization of the facts is squarely wrong. Grisby's defense was that he was not armed and that Frazier did all the shooting. He testified that he saw Frazier inflict contact wounds to the heads of two victims. Frazier, on the other hand, admitted he did the initial shooting, but he implicated Grisby as the person who inflicted *all* the contact wounds in an attempt to avoid conviction of murder on a theory of premeditation and deliberation. The defendants did not "agree they went to the Walker apartment armed". Grisby claimed he had no gun and Frazier

claimed they were both armed. Obviously, the "sole disagreement" was not as to "who killed which victims." Grisby claimed he shot no one; Frazier claimed he shot only some of the victims. The defenses of Frazier and Grisby diverged as to who was armed and as to who committed the critically inculpatory acts. And where each defendant's theory diverged it was at the expense of the other defendant. Only by imposing its own judgment on all the evidence presented at trial could the majority conclude the only question was "who killed which victims." But such a judgment is irrelevant to determining whether severance would have promoted a fair determination of guilt or innocence.

The discretion a trial court has to decide if severance is "appropriate" is given guidance by our rule. In this case the appellants did not simply allege antagonistic defenses. *People v. Cart,* 102 Ill. App. 3d 173, 429 N.E.2d 553 (1981). The court was fully aware that Grisby had given the police a statement exculpating himself at Frazier's expense. The antagonism portended at the pretrial hearing was fully borne out at trial. Under such circumstances, the defendants were subject to potential unfairness. The jury might justifiably infer the conflict between Frazier and Grisby alone demonstrated the guilt of both. *United States v. Haldeman,* 559 F.2d 31 (D.C. Cir. 1976).[4] Unquestionably, fairness would have been promoted by severance.

When a trial court ascertains that defenses are truly antagonistic, severance should be granted. The majority argues that such a matter of law requirement is inappropriate; a defendant must also demonstrate "specific prejudice." Majority opinion, at 507. I submit that if defenses are truly antagonistic, prejudice is demonstrated. A separate demonstration of prejudice would be redundant. The

---

[4]The federal cases cited by the majority, *United States v. Davis,* 663 F.2d 824, 832 (9th Cir. 1981) and *United States v. Davis,* 623 F.2d 188, 194–95 (1st Cir. 1980) are not inconsistent with the view taken here. The facts in those cases differ greatly from those presented here, and both cases recognize that when defenses are antagonistic to the point of irreconcilability, as was the case here, severance should be granted.

prejudice that occurs from the joinder of two truly antagonistic defenses is the potential of guilt being ascertained solely by reason of the conflict between the two defenses. Severance is not required simply because a defendant's chances of acquittal would be better. It is required only to prevent a demonstrable unfairness from occurring. Such a demonstration was made in this case.

While our cases do not document instances of severance because of mutually antagonistic defenses, many of our decisions have suggested the validity of such a basis for severance. *See State v. Todd,* 78 Wn.2d 362, 474 P.2d 542 (1970); *State v. Smith,* 74 Wn.2d 744, 446 P.2d 571 (1968), *vacated on other grounds,* 408 U.S. 934, 33 L. Ed. 2d 747, 92 S. Ct. 2852 (1972) (and *overruled on other grounds* by *State v. Gosby,* 85 Wn.2d 758, 539 P.2d 680 (1975)). *See also State v. Ogle,* 78 Wn.2d 86, 469 P.2d 918 (1970); *State v. Palmer,* 73 Wn.2d 462, 438 P.2d 876 (1968).

Numerous jurisdictions have held the existence of antagonistic defenses such as exist in this case warrant severance. *United States v. Johnson,* 478 F.2d 1129 (5th Cir. 1973); *People v. Lee,* 87 Ill. 2d 182, 429 N.E.2d 461 (1981); *People v. Higginbotham,* 56 Ill. App. 2d 140, 205 N.E.2d 273 (1965); *People v. Hurst,* 396 Mich. 1, 238 N.W.2d 6 (1976); *People v. Aguilar,* 105 Mich. App. 258, 306 N.W.2d 472 (1981); *State v. Varricchio,* 176 Conn. 445, 408 A.2d 239 (1979); *State v. Holup,* 167 Conn. 240, 355 A.2d 119 (1974); *Johnson v. United States,* 398 A.2d 354 (D.C. 1979); *Murray v. State,* 528 P.2d 739 (Okla. Crim. App. 1974); *State v. Thibodeaux,* 315 So. 2d 769 (La. 1975); *Huff v. State,* 409 So. 2d 144 (Fla. Dist. Ct. App. 1982). Doubts as to the balance between fairness and economy should be resolved in favor of severance. *State v. Collins,* 612 P.2d 775 (Utah 1980).

"In the trial of a person charged with the commission of a crime, it is more important to enforce the time–tested safeguards which the law has erected for the protection of the innocent than to distort and subvert them in order to block the escape from punishment of even an appar-

ently guilty person. Such has ever been the policy of this state.

*State v. Holup, supra* at 246–47. Ultimately economy itself will be served by erring on the side of promoting a fair determination of guilt or innocence. Severance will avoid unnecessary appeals and retrials. In a case such as this where the prosecution sought the death penalty, a trial court must be particularly sensitive to promoting fairness. The court must safeguard the defendant's right to be judged as an individual. *See Lockett v. Ohio,* 438 U.S. 586, 605, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978). Recognizing the difference between death penalty and other criminal cases, the Georgia Legislature has given a defendant in a capital case the absolute right to be tried separately. Ga. Code Ann. § 27–2101 (1981). *See Reaves v. State,* 242 Ga. 542, 250 S.E.2d 376 (1978). Where, as here, the defendants have shown that each defense will attempt to exculpate one defendant by way of inculpating the other, severance is appropriate. The trial court erred in refusing the appellants' requests to sever their trials.

WILLIAMS, J., concurs with UTTER, J.

Reconsideration denied August 24, 1982.