[No. 16465-5-II.   Division Two.   July 12, 1995.]

THE STATE OF WASHINGTON, *Respondent*, v. ORLANDIS DONTE CAMPBELL, *Appellant*.

*James L. Reese III,* for appellant (appointed counsel for appeal).

*Russell D. Hauge, Prosecuting Attorney,* and *Seth Aaron Fine, Deputy Prosecuting Attorney for Snohomish County,* for respondent.

SEINFELD, C.J. — The State tried Orlandis Donte Campbell with fellow youth gang member, Eugene Youngblood, for two counts of first degree murder and one count of conspiracy to commit first degree premeditated murder of rival gang members. The jury convicted Campbell as charged. Campbell's 121 assignments of error include challenges to the admission of evidence about Campbell's gang activities and of expert testimony about the customs and conduct of gang members, and the denial of his motions to sever, for a continuance, and for a mistrial based upon prosecutorial misconduct. We conclude that the trial court found a sufficient nexus between gang affiliation and the homicides to justify the admission of the gang culture evidence. We further conclude that the trial court properly exercised its discretion in all its rulings. Thus, we affirm.

## FACTS

Orlandis Dante Campbell was a self-proclaimed member of the Los Angeles Santana Blocc Crips gang and in the business of selling crack cocaine. Lewis Davis's apartment in Bremerton was one of Campbell's sales locations.

Tyrone Darcheville and Arthur Lewis Randall, the murder victims, were Bremerton teenagers affiliated with a local gang, the Acacia Blocc Crips. They also sold crack cocaine at Lewis Davis's apartment.

Campbell was friendly with Darcheville and Randall until late 1991, at which time the relationship soured and

Campbell began threatening to jack[1], check[2], and kill the two youths. Around the same time, Campbell began to associate with Ernest Bailey and Eugene Youngblood. Both Bailey and Youngblood were from Los Angeles and were members of a Los Angeles gang, the Mansfield Gangsters Crips. Bailey and Youngblood looked down on the Bremerton Crips, calling them wannabes and punks. Campbell came to join in these sentiments.

Campbell, Bailey, and Youngblood began selling crack cocaine together from hotel rooms and from Lewis Davis's apartment. Their customers included many of the people to whom Darcheville and Randall sold. But many of their customers considered Darcheville and Randall's crack to be of a higher quality.

During the second or third week of December 1991, Darcheville confronted Campbell and Bailey, telling them that they had no right to sell crack out of Lewis's apartment. Campbell and Bailey believed that Darcheville was "out of pocket" and needed to be disciplined.

On December 19, the night before the murders, witnesses observed Campbell, Bailey, and Youngblood at a Tacoma apartment selecting dark-colored clothing items. Bailey, who had a gun and was collecting bullets, said that he was going to "gat someone."[3] Witnesses also overheard the threesome talking about fixing the wannabes that evening.

On December 20, Campbell and Bailey, dressed in dark clothes, met Darcheville and Randall at about 6 P.M. at an acquaintance's house. The group left the house together at about 6:40. Randall indicated that he would be back in fifteen minutes. About thirty minutes later, witnesses found Darcheville's and Randall's bodies. Both had sustained multiple, fatal gunshot wounds.

---

[1]Los Angeles Police Department Detective Michael DePasquale defined "to jack" someone as to take something from that person.

[2]Alfonso Dixon defined "to check" someone as to punch that person.

[3]A "gat" is a gun.

Neighbors reported hearing noises consistent with gunshots between 6:55 P.M. and 7:15 P.M. One neighbor saw four or five individuals talking loudly outside the residence shortly before shots were fired; another neighbor saw three darkly clad individuals milling about in the street immediately after the shots were fired.

Campbell, Bailey, and Youngblood, all dressed in black, next appeared at Davis's apartment. Davis's sister heard either Campbell or Youngblood say, "I told you we were going to get those mother fuckers. I told you we was the baddest ones in Bremerton." Shortly thereafter, Campbell indicated that he was leaving for California that night. The three men left together, and were stopped by an Oregon deputy sheriff for speeding early the following morning. Bailey was driving Youngblood's Buick Regal.

On December 27, 1991, the State filed its information, charging Campbell and Bailey with two counts of first degree murder by two means: premeditation and felony murder predicated on robbery. The police arrested Campbell for the murders on March 6. In a postarrest statement Campbell admitted knowing Bailey, Darcheville, and Randall, but denied any involvement in the murders. However, while in jail, Campbell admitted to another inmate that he had shot Darcheville and Randall in the head and the chest.

On March 9, 1992, the State amended the information to include a count of conspiracy to commit first degree premeditated murder. On the first day of pretrial proceedings, March 17, the State moved to join Campbell's case with Youngblood's. The court granted the motion and ordered trial to commence on May 4, 1992. Pretrial hearings continued past the set trial date. The State did not present testimony until May 27.

Pretrial proceedings included lengthy motions in limine regarding the admission of evidence of the defendants' prior bad acts and of expert testimony on gang behavior. The State sought to introduce this evidence to prove a motive for the murders: the defendants killed the victims

because the victims did not accord them the appropriate respect and were usurping the defendants' economic drug turf, and because the defendants thought of themselves as being members of a superior gang.

The trial court determined there was a nexus between gang culture, gang activity, gang affiliation, drugs, and the homicides of Darcheville and Randall. Based on this determination, it allowed the introduction of evidence of Campbell's gang affiliation and drug selling activity. It also ruled admissible expert testimony on gang culture for the purpose of showing premeditation, intent, motive, and opportunity. However, the trial court carefully limited the testimony, excluding matters that it considered more prejudicial than probative. For example, the trial court excluded evidence of Campbell's December 1988 robbery conviction; of police investigations connecting Campbell to a stabbing incident and to a shooting incident; expert opinion that the Mansfield Gangster Crips are particularly adept at selling drugs and deal drugs in cities other than Los Angeles; and expert opinion about the meaning of dark clothing and that gang members ordinarily carry and use guns.

Campbell made repeated motions to sever his trial from Youngblood's and repeated motions for continuances. The trial court denied these motions. It also overruled his objection to the May 11, 1992, filing of an amended information adding first degree burglary as an additional basis for felony murder.

The jury found Campbell guilty of both counts of felony murder in the first degree and of conspiracy to commit premeditated first degree murder. It acquitted him of premeditated first degree murder.

I

Campbell contends that the trial court erred in joining his case with Youngblood's, or, in the alternative, in denying his repeated motions to sever his case from Youngblood's. The State charged Youngblood with the same

crimes with which it had previously charged Campbell. Thus, joinder was appropriate. *See* CrR 4.3(b)(1).

Campbell argues severance was necessary (1) to protect Youngblood's speedy trial rights; (2) to protect his right to confront witnesses; and (3) to protect him from being tarred by evidence regarding Youngblood's gang membership.

The law does not favor separate trials. *State v. Grisby*, 97 Wn.2d 493, 506, 647 P.2d 6 (1982), *cert. denied*, 459 U.S. 1211 (1983). We review the denial of a motion to sever for abuse of discretion. *Grisby*, 97 Wn.2d at 507. " 'Separate trials should be required only in those instances in which an out-of-court statement by a codefendant expressly or by direct inference from the statement incriminates his fellow defendant.' " *Grisby*, 97 Wn.2d at 507 (*quoting State v. Ferguson*, 3 Wn. App. 898, 906, 479 P.2d 114 (1970), *review denied*, 78 Wn.2d 996 (1971)). A limiting instruction is ineffective and severance is appropriate only when testimony includes "powerfully incriminating extrajudicial statements of a codefendant." *State v. Dent*, 123 Wn.2d 467, 486, 869 P.2d 392 (1994) (quoting *Bruton v. United States*, 391 U.S. 123, 135-36, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968)).

Campbell's arguments are not persuasive. First, he cannot assert Youngblood's speedy trial rights. Only Youngblood has standing to do this. *See State v. Gutierrez*, 50 Wn. App. 583, 591-92, 749 P.2d 213, *review denied*, 110 Wn.2d 1032 (1988).

His second concern about confrontation relates to exhibit 228-B, a letter that Youngblood wrote to Campbell. "Juice," Campbell's street name, was not redacted from the letter. In the letter, Youngblood asks Campbell if Campbell is going to help him by saying what Youngblood told Campbell to say in a prior letter. However, nothing in the letter expressly or by direct inference incriminates Campbell in the murders of Darcheville and Randall; it does not contain the sort of powerfully incriminating information that would make severance mandatory.

Campbell's argument that he was somehow tarred by evidence of Youngblood's gang membership is also without merit.

> No authority is cited for the proposition that one defendant's objectionable background or reputation might rub off onto a codefendant and thereby constitute cause for separate trials. We perceive no merit in this argument.

*State v. Hoffman*, 116 Wn.2d 51, 74-75, 804 P.2d 577 (1991).

## II

■ Campbell argues that the trial court erred in denying his repeated motions for a continuance. We review a trial court's refusal to grant a continuance for abuse of discretion. *State v. Purdom*, 106 Wn.2d 745, 748, 725 P.2d 622 (1986). Failure to grant a continuance is an abuse of discretion only if the result of the trial probably would have been different had the trial court granted a continuance or if the trial court denied a continuance for untenable reasons. *State v. Angulo*, 69 Wn. App. 337, 341-42, 848 P.2d 1276, *review denied*, 122 Wn.2d 1008 (1993); *State v. Kelly*, 32 Wn. App. 112, 114, 645 P.2d 1146, *review denied*, 97 Wn.2d 1037 (1982).

Campbell does not show how the trial outcome would have differed had he obtained a continuance; nor does he show that the trial court denied his motions for untenable reasons. We find no abuse of discretion here.

## III

Campbell also challenges the State's amendment of the information on May 11, the day before jury selection, without granting him a continuance. CrR 2.1(d) allows a court to permit an amendment to an information at any time before verdict if the amendment does not prejudice substantial rights of the defendant. Campbell does not show such prejudice.

As the State had already charged Campbell with felony murder predicated on first or second degree robbery, the

first degree burglary charge added only the element of entry into the dwelling where the homicides took place with the intent to commit a crime therein. *Compare* RCW 9A.52.020(1) and 9A.56.190, .200, and .210. In light of the existing charges and the nature of the case, Campbell did not need a continuance to defend against this additional charge. The burden of the amendment fell mostly on the State. Further, the court dismissed the burglary charge at the close of the State's case. Thus, Campbell has not shown that the filing of the amendment prejudiced a substantial right.

## IV

Campbell argues that the trial court improperly admitted evidence of his gang affiliation and drug dealing. He contends that this violated the evidence rules and his First Amendment freedom of association rights.

The trial court admitted this evidence as proof of Campbell's premeditation, motive, and intent. Evidence of other crimes or bad acts is admissible under ER 404(b) as proof of premeditation, intent, motive, and opportunity. In applying ER 404(b), a trial court must engage in a three step analysis: determine the purpose for which the evidence is offered; determine the relevance of the evidence, i.e., whether the purpose for which the evidence is offered is of consequence to the outcome of the action and tends to make the existence of an identified fact more probable; and lastly, balance on the record the probative value of the evidence against its prejudicial effect. *State v. Dennison*, 115 Wn.2d 609, 628, 801 P.2d 193 (1990). An appellate court will review a trial court's ER 404(b) rulings for abuse of discretion. *Dennison*, 115 Wn. 2d at 628.

As stated, the trial court admitted the challenged evidence for legitimate purposes of consequence to the action. The fact that Campbell was a member of a gang and a drug dealer provided the basis for the State's theory of the case. The only issue is whether the trial court abused its discretion in concluding that this evidence was not more prejudicial than probative.

The challenged evidence clearly was highly probative of the State's theory — that Campbell was a gang member who responded with violence to challenges to his status and to invasions of his drug sales territory. In carefully explained rulings, the trial court excluded those portions of the evidence that were unduly prejudicial. We find no error.

■ Campbell also contends that the evidence of his gang affiliation was unnecessarily cumulative. However, he disputed that he was a gang member. Thus, the trial court did not abuse its discretion in allowing several lay witnesses to testify that Campbell was a gang member. *See Christensen v. Munsen*, 123 Wn.2d 234, 241, 867 P.2d 626, 30 A.L.R.5th 822 (1994).

■ Campbell also challenges the trial court's conclusion that a sufficient nexus existed between the alleged crimes and gang activity. The State presented evidence that the killings were the result of rival gang activity; that the victims had shown disrespect for the defendants and had intruded on the defendants' drug selling turf. It then showed that in gang culture, these are grounds for retaliation and murder. This showing was sufficient.

■ Campbell's argument that the gang testimony infringed on his First Amendment right to association is also without merit. The First Amendment does not erect an absolute bar to the admission of associational evidence. *Dawson v. Delaware*, 503 U.S. 159, 164-67, 112 S. Ct. 1093, 117 L. Ed. 2d 309 (1992). Association evidence is only inadmissible when it proves nothing more than a defendant's abstract beliefs. *Dawson*, 503 U.S. at 164-67. This evidence is admissible when relevant to an issue in a case. *See Dawson*, 503 U.S. at 164-67; *United States v. Robinson*, 978 F.2d 1554, 1565 (10th Cir. 1992), *cert. denied*, 113 S. Ct. 2938 (1993). As discussed above, evidence of Campbell's gang affiliation was relevant to show motive. Thus, its

admission did not violate Campbell's First Amendment rights.

## V

Campbell argues that the trial court erred in allowing three police officers to testify as gang experts because the experts were not "from the same neighborhood, city or county" as the gangs about which they testified. The State's gang experts explained the meaning of gang terminology and symbols, the types of criminal activities in which gangs were involved, gang codes of conduct, and discipline of violators, gang interactions with other gangs and "wannabe" gang members, and the organizational structure and history of gangs.

An expert need not acquire his knowledge through personal experience. ER 702.[4] ER 702 allows an expert to testify if "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." The expert testimony on gang terminology and gang symbols assisted the trier of fact understand the State's theory of the case and was relevant to show Campbell's premeditation, intent, and motive.

Here too, Campbell argues that the testimony was cumulative. However, the State's experts generally testified about different aspects of gang behavior; the testimony generally was not cumulative. The trial court did not abuse its discretion in allowing the expert gang testimony.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

---

[4]We note that the trial court analyzed the admission of this testimony under ER 404(b), which governs the admission of other crimes and bad acts. However, the gang experts did not testify about Campbell's other crimes and bad acts. *See State v. Tharp*, 96 Wn.2d 591, 594, 637 P.2d 961 (1981). Nonetheless, the admission of the evidence is not reversible error if it was admissible for a different purpose. *State v. Stanton*, 68 Wn. App. 855, 864, 845 P.2d 1365 (1993).

824

HOUGHTON and FLEISHER, JJ., concur.

Review denied at 128 Wn.2d 1004 (1995).