IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31865-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MYKEL THOMAS STRASSER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Mykel Strasser appeals his judgment and sentence for first

degree burglary and first degree robbery, making three assignments of error. He

contends that the trial court erred by instructing the jury on deadly weapon enhancements

that were not supported by evidence, that prosecutorial misconduct requires a new trial,

and that the court's inclusion of "abiding belief in the truth of the charge" language in its

instruction on the burden of proof deprived him of a fair trial. Finding no error, we

affirm.

FACTS AND PROCEDURAL BACKGROUND

Mykel Strasser and Sean Mustard[1] were friends who enjoyed riding bikes and

_____

[1] Because multiple members of the Mustard family are discussed, first names are
used. No disrespect is intended.

partying together. Sean's mother, Karin, and her then-boyfriend, Thomas Moses, became

acquainted with Mr. Strasser from his time spent with Sean at the Mustard home.

Late one evening in early November 2011, Mr. Strasser and four other individuals

forced their way into the Mustard home, yelled at and threatened the inhabitants, rifled

through Sean's bedroom, and left with a number of his belongings. Sean, Karin and Mr.

Moses all witnessed the home invasion and recognized Mr. Strasser. Mr. Strasser and

another individual wielded baseball bats during the intrusion, one of which belonged to

Sean and was picked up after the intruders broke through the door and entered the home.

Karin called 911 during the fray and told the dispatcher that one of the intruders

was "Mykel," whose last name she did not know. By the time police officers responded

to the 911 call the intruders were gone, but the officers took Mr. Strasser's name and an

arrest warrant issued.

Karin would later testify that during the course of the crime, Sean pleaded with

Mr. Strasser and the other intruders as if they were engaged in some misguided revenge.

According to her,

> [Sean] kept saying, Mykel, why are you doing this? Mykel, tell them
> straight up what's going on. Tell them the truth. You know, don't do this
> to me. Tell them the truth. And he was saying to the other guys, Do you
> not know that this guy is shining you on? He's not believable.

Report of Proceedings (RP) at 127. She also testified that when one of the intruders

raised his bat as if to smash the family's flat screen television, Karin screamed "no" and

the intruder responded, "You better tell your F'ing [son] not to F with us or we will come

back and F with you." RP at 125.

Mr. Strasser was charged with first degree burglary and first degree robbery, and deadly weapon enhancements were sought in connection with both counts based on Mr. Strasser's or another participant's being "armed with a baseball bat, a deadly weapon." Clerk's Papers (CP) at 1-2. The State's theory of the motive for the crime was that several weeks earlier, Mr. Strasser and Sean had been at a house party at which Mr. Strasser stole someone's laptop and iPod. The State theorized that in an effort to deflect suspicion from himself, Mr. Strasser told the victim that Sean stole the items. The State suggested that the burglary and robbery was an effort by the victim and his accomplices to recover the stolen items or punish Sean for his theft.

Mr. Strasser denied being present on the night of the burglary and robbery. He claimed that it was Sean, not him, who stole a laptop and iPod from someone at the house party. He accused Sean of falsely implicating him in the Mustard home invasion as an act of revenge.

The jury found Mr. Strasser guilty as charged and returned special verdicts finding that he or another participant had used a deadly weapon in the course of the crime. Mr. Strasser appeals.

## ANALYSIS

We address in turn Mr. Strasser's three assignments of error: that the trial court erred by instructing the jury on a deadly weapon enhancement, that prosecutorial

3

misconduct requires a new trial, and that the court's inclusion of "abiding belief in the truth of the charge" language in its instruction on the burden of proof deprived him of a fair trial.

*Instruction on deadly weapon enhancement*

Mr. Strasser objected to the giving of an instruction on use of a deadly weapon "because of the way the evidence came out." RP at 332. He argued that because a baseball bat is not identified by RCW 9.94A.825 as a per se deadly weapon for purposes of a sentence enhancement, instruction should not have been given unless there was evidence that the bats used met the statute's definition as "an implement or instrument which has the capacity to inflict death and from the manner in which it is used is likely . . . to produce or may easily and readily produce death." RP at 336. While Mr. Strasser conceded in the trial court that a baseball bat has the capacity to inflict death, he argued that because a bat was never used to strike anyone during the home invasion, it was not used in a manner likely, easily, or readily to produce death.

In *State v. Peterson*, 138 Wn. App. 477, 157 P.3d 446 (2007), the court distinguished between the capacity of a non-per se deadly weapon to inflict death and its use in a way likely, easily, or readily to produce death. The weapon in that case was a locking knife with a blade that was only three inches, and at that length was not a per se deadly weapon for purposes of the sentencing enhancement. On appeal, the court assumed without deciding that the folding blade had the capacity to produce death. *Id.* at

4

484. But because it was used during the commission of the charged crime (malicious

mischief) only to pry loose and cut wires on a car stereo, the court concluded that it had

not been used in a way that was likely, easily, or readily to produce death.

It was significant to the court in *Peterson* that no one was around during

Peterson's removal of the car stereo against whom he could have used or threatened to

use the knife. The only individual who witnessed the knife arrived as Peterson completed

the crime and fled. The court reasoned:

> Th[e] second criterion—"from the manner in which it is used, is likely to
> produce or may easily and readily produce death["]—implies the presence
> of another person against whom Peterson could have readily used the knife
> while committing the malicious mischief. But there is no evidence that any
> other person was present or nearby while Peterson was using the knife to
> cut the stereo wires or, from Peterson's "manner of use" of the knife, that
> he would have used it to assault [the individual who arrived as Petersen was
> completing the crime] had he approached Peterson while still in [the] car
> cutting the stereo wires.
>
> On the contrary, when [the individual approached the] car, Peterson jumped
> out of the car, fled across the parking, and attempted to escape capture and
> confrontation by leaping into the bushes; Peterson did not threaten [the
> individual] with the knife [during his initial flight with the stereo].
>
> We agree with Peterson that (1) at the time he was using the knife to cut the
> stereo wires, there were no other persons present against whom he could
> have used the knife in a deadly manner; and (2) his manner of use of the
> knife during the malicious mischief was not likely or easily and readily able
> to produce death.

*Id.* at 484-85.

*State v. Cook*, 69 Wn. App. 412, 848 P.2d 1325 (1993) also supports the

proposition that an actual injury is not required to satisfy the criterion that a non-per se

5

deadly weapon "be used in a manner likely to produce or that may easily and readily produce death"—threatened injury will suffice. *Peterson*, 138 Wn. App. at 484-85. In *Cook*, the defendant held a pocket knife with a blade shorter than three inches to the throat of a robbery victim. Rather than give the pattern instruction defining a deadly weapon for purposes of a special verdict, the trial court fashioned its own instruction, which was found on appeal to be erroneous. The instructional error was found to be harmless, however, because while the victim was not injured, it was undisputed that the pocket knife had been held to his throat, and "[c]learly, under these facts, the knife had the 'capacity to inflict death', and was used in a manner which would 'likely . . . or [might] easily and readily produce death.'" *Id.* at 418 (second and third alterations in original) (quoting former RCW 9.94A.125 (1981)).

In this case, some of the trial testimony about the intruders' use of baseball bats addressed the threatened use of the bats to break property. But Karin testified that in the course of the chaos and confusion, "I was threatened by a baseball bat." RP at 124. She testified that as the intruders were leaving the home and Sean followed in an effort to get a license plate number from their car, Mr. Strasser tried to block him and "at one point held a bat up and was going to hit Sean, and [a] neighbor stepped in between." RP at 129. She later reiterated that Mr. Strasser "went to hit my son. He brought [the bat] up to bring it down on my son." RP at 131.

Mr. Moses testified that as the intruders were stealing items from Sean's bedroom,

> [T]here was a—there was a big kid standing in front of the computer and he had a baseball bat. And—and now, you know, I'm—I'm pretty good size but a high schooler with a baseball bat can take care of me, no problem at all. I'm not stupid. And—and so I just kind of watched.

RP at 155.

Sean testified to being threatened with a baseball bat both at the inception and toward the conclusion of the crime. He testified that one of the first things that happened was that one of the intruders "comes right in the door and grabs my baseball bat and comes right for me, and I step out of the way." RP at 275. As the intruders left the home with his belongings, he testified that he was at the doorway, yelling, when Mr. Strasser "grabbed my baseball bat":

> And I'm in the doorway and he, like, charged me like he was going to hit me with it and I, like, stepped out of the way, like onto the front porch. And he comes down the stairs, and that's when my—my neighbor is, like, right there because she heard all the yelling and stuff. She's, like, between my yard and her yard, like right there on the grass, and he charged at me like he was going to hit me and he went up to her, like, stood in her face and said something like, Do something, or something. I don't even know what he said to her. Then he took off.

RP at 280.

As Mr. Strasser conceded below, a baseball bat has the capacity to inflict death. There was sufficient testimony about the threatening manner in which baseball bats were used during the burglary and robbery to support the trial court's decision to instruct the jury on the deadly weapon enhancement.

7

*Prosecutorial misconduct*

Mr. Strasser complains that during opening statements, the prosecutor told the jury that Mr. Strasser's mother would testify but that she would not be credible because she wanted to protect her son. The prosecutor also told the jury that Mr. Strasser's defense would be that he wasn't involved and "this didn't happen." Br. of Appellant at 10. Finally, Mr. Strasser complains that the prosecutor "constructed a motive" by repeatedly telling the court and the jury that the burglary was linked to an earlier theft of a laptop and iPod "but failed to produce any testimony at trial to substantiate these claims." *Id.* at 17. Taken together, he claims, the State "effectively shifted the burden to Mr. Strasser to produce witnesses and put on a specific defense." *Id.* He argues that the misconduct requires a new trial.

A defendant claiming prosecutorial misconduct bears the burden of proving "'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'" *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008) (quoting *State v. Hughes*, 118 Wn. App. 713, 727, 77 P.3d 681 (2003)). Where, as here, no objection was made to the prosecutor's statements during the trial, the defendant is deemed to have waived any error unless the prosecutor's misconduct "'is so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by a curative instruction to the jury.'" *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006) (quoting *State v. Brown*, 132 Wn.2d 529, 561, 940

P.2d 546 (1997)). In analyzing prejudice, we do not look at a prosecutor's comments in isolation but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury. *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007).

"A prosecutor's opening statement should be confined to a brief statement of the issues of the case, an outline of the anticipated material evidence, and reasonable inferences to be drawn therefrom." *State v. Campbell*, 103 Wn.2d 1, 15-16, 691 P.2d 929 (1984). "Testimony may be anticipated so long as counsel has a good faith belief such testimony will be produced at trial." *Id.* at 16 (citing *State v. Grisby*, 97 Wn.2d 493, 499, 647 P.2d 6 (1982)). The trial court has wide discretion in determining the good faith of the prosecutor and the burden of showing bad faith is upon the defendant. *Id.*

Statements about Mr. Strasser's anticipated defense—both his mother's support and his claim that he wasn't involved—were potentially problematic, because a defendant is under no obligation to put forward evidence on his or her own behalf, and the statements might be understood by the jury to suggest he needs to do so.[2] *United States v. Hall*, 165 F.3d 1095, 1115 (7th Cir. 1999) ("We believe it to be a rare situation where it would be appropriate for a prosecutor to comment on anticipated defense evidence

---

[2] The prosecutor said:

> You're going to hear from the defense that says that Mr. Strasser wasn't a part of this, that this didn't happen.

RP at 111.

9

because a defendant is under no obligation to put forward evidence on his or her own behalf"); 13 WASHINGTON PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 4204 at 218-19 (3d ed. 2004) ("The prosecutor may not state what he thinks the defense will be, and he may not tell the jurors what he expects to offer in rebuttal."). But because Mr. Strasser did not object, we evaluate the statements for flagrant, ill-intentioned conduct and enduring prejudice, none of which is present here. The prosecutor's statement in opening that Mr. Strasser would deny being present was followed within moments by Mr. Strasser's own opening statement, in which the defense argued, "The theory of our case is very simple: that Mykel Strasser was not involved in this incident at the Mustard house." RP at 116. It is understandable that the defense did not object to the prosecutor's anticipation of that defense.

The statement about Mr. Strasser's mother's credibility that the prosecutor made during his opening was not an outline of anticipated material evidence, it was argument, and it should have been deferred to the end of the case.[3] But the premature and very brief argument about a mother's bias in favor of her child presented no risk of enduring

---

[3] The prosecutor said:

> The defense may call the defendant's mother. And you'll get to assess whether she's biased in trying to protect, understandably so, trying to protect her son. But as the jury, you're here to determine what happened. What was the truth of that night.

RP at 113.

10

prejudice. Had Mr. Strasser objected, his objection would presumably have been sustained and the premature presentation of argument would have been neutralized.

The prosecutor's anticipation of evidence of the theft of the laptop and the iPod was not problematic; it was borne out by evidence and argument later presented by both sides. Mr. Strasser referred to the theft in opening statement. Sean testified at trial to *Mr. Strasser's* theft of the items from the house party. Mr. Strasser testified at trial to *Sean's* theft of the items from the party. In support of the State's theory of motive, Sean testified that he recognized one of the men who broke into his house as someone from the house party—a possible victim of the theft—and that the individual he recognized from the house party rummaged through Sean's belongings saying, "Where's the laptop, where's the laptop, where's it at?" RP at 277.

The theft at the house party was material, supporting the State's theory of a motive for the burglary and robbery. The fact that evidence of the theft was presented during trial and that both parties argued inferences from the evidence demonstrates that the prosecutor's anticipation of the evidence was in good faith.

*Burden of proof instruction*

Finally, Mr. Strasser complains that the court provided the jury with the pattern burden of proof instruction for criminal trials including its bracketed, optional final sentence. The last paragraph of the instruction read:

> A reasonable doubt is one for which a reason exists and may arise
> from the evidence or lack of evidence. It is such a doubt as would exist in

11

the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.

CP at 38; 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.01, at 85 (3d ed. 2008) (WPIC). Relying on cases holding that the State may not argue that a jury's job is to search for the truth, Mr. Strasser argues that the final sentence of the instruction "inexorably connects the concepts of truth and being satisfied beyond a reasonable doubt." Br. of Appellant at 19.

We review a challenged jury instruction de novo, evaluating it in the context of the instructions as a whole. *State v. Pirtle*, 127 Wn.2d 628, 656, 904 P.2d 245 (1995).

Language speaking of an "abiding belief" or an "abiding conviction" in "the truth of the charge" has withstood challenge in Washington for more than a half century. In *State v. Mabry*, 51 Wn. App. 24, 25, 751 P.2d 882 (1988), this court upheld the almost identical concluding statement in WPIC 4.01, as revised in 1982, the only difference being the former instruction's use of the expression "*after* such consideration" rather than "*from* such consideration." *Id.* The court observed that the instruction "was approved essentially in *State v. Tanzymore*, 54 Wn.2d 290, 340 P.2d 178 (1959),[4] and was also

---

[4] The instruction given in *Tanzymore* included the statement, "If, after a careful consideration and comparison of all the evidence, you can say you have an abiding conviction of the truth of the charge, you are satisfied beyond a reasonable doubt." 54 Wn.2d at 291, n.2. In rejecting the defendant's argument that his own proposed instruction should have been given, the court said that the standard instruction given by the court, "has been accepted as a correct statement of the law for so many years, we find

approved as modified in *State v. Walker*, 19 Wn. App. 881, 578 P.2d 83 [1978]." *Id.* It

pointed out that "[w]hen reviewing 'reasonable doubt' instructions, courts have refused to

isolate a particular phrase and have instead construed them as a whole." *Id.*

In *Pirtle*, our Supreme Court addressed a challenge to a trial court's modification

of the concluding sentence to sharpen the focus on a juror's doubt by stating, "If, after

such consideration you *do not* have an abiding belief in the *truth* of the charge, you *are*

*not* satisfied beyond a reasonable doubt." 127 Wn.2d at 656 (emphasis added). The

revised instruction was still upheld:

> Without the last sentence, the jury instruction here follows WPIC
> 4.01, which previously has passed constitutional muster. The addition of
> the last sentence does not diminish the definition of reasonable doubt given
> in the first two sentences, but neither does it add anything of substance to
> WPIC 4.01. WPIC 4.01 adequately defines reasonable doubt. Addition of
> the last sentence was unnecessary but was not an error.

*Pirtle*, 127 Wn.2d at 658.

Mr. Strasser contends that more recent decisions in *State v. Emery*, 174 Wn.2d

741, 278 P.2d 653 (2012) and *State v. Berube*, 171 Wn. App. 103, 286 P.3d 402 (2012)

require us to reconsider this longstanding precedent. In *Emery*, our Supreme Court held

that it was prosecutorial misconduct for the State to suggest in argument that the jury's

job is to solve the case, because "[t]he jury's job is not to determine the truth of what

happened; a jury therefore does not speak the truth or declare the truth." 174 Wn.2d at

the assignment without merit." *Id.* at 291.

13

760 (internal quotation marks omitted). Similar improper argument was made in *Berube*, in which this court stated that "[A]rguing that the jury should search for truth and not for reasonable doubt both misstates the jury's duty and sweeps away the State's burden. The question for any jury is whether the burden of proof has been carried by the party who bears it." *Id.* at 120.

The last sentence of WPIC 4.01 is not tantamount to telling the jury that it must "solve the case" or "find the truth." *Pirtle* remains controlling authority that without the last sentence, the pattern instruction adequately defines reasonable doubt and that inclusion of the optional sentence "does not diminish the definition." 127 Wn.2d at 658.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, C.J.

WE CONCUR:

Fearing, J.

Lawrence-Berrey, J.

14