

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 75649-4-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CHAD ALLEN LESTER TIBBITS, | ) | |
| | ) | |
| Appellant. | ) | FILED: December 5, 2016 |

SCHINDLER, J. — A jury convicted Chad Allen Lester Tibbits of assault in the first degree and criminal mistreatment in the second degree of his two-month-old baby. By special verdict, the jury found manifest deliberate cruelty, vulnerable victim, and abuse of position of trust. Tibbits seeks reversal arguing insufficient evidence supports the convictions or the alternative means of committing assault in the first degree, admission of the codefendant's statement violated his constitutional right to confrontation, prosecutorial misconduct deprived him of his right to a fair trial, and his attorney provided ineffective assistance of counsel. In the alternative, Tibbits argues the court improperly entered a finding that increased the mandatory minimum sentence. We affirm the convictions and remand for resentencing.

FACTS

Twenty-one-year-old Chad Allen Lester Tibbits and twenty-year-old Katarina M. Shivers were in a dating relationship. On February 22, 2014, Shivers gave birth to A.T.

Tibbits, Shivers, and their newborn baby lived with Tibbits's parents Lester and Penny Tibbits. Shivers took care of the baby during the day and Tibbits took care of the baby at night. The doctor saw the baby for a checkup on April 3 and for immunization on April 23.

At some point before April 28, Lester saw a bruise near A.T.'s eye.[1] Tibbits told Lester the baby "must have hit his necklaces." Shivers's sister Trina Rouska also noticed a bruise near the baby's eye. Shivers told Rouska the baby accidently hit itself in the eye while swinging its arms.

Approximately a week before April 28, Shivers's mother Lauriette McClure noticed a bruise on A.T.'s forehead near the temple. Shivers told McClure that "[Tibbits]'s necklace hit the baby." Rouska and McClure said Shivers kept A.T. almost completely covered with hats, gloves, onesies, pants, shirts, and blankets and would not let McClure change the baby's diapers.

Shortly before midnight on April 28, 2014, Shivers handed A.T. to Tibbits while she went to the bathroom. When Shivers returned, Tibbits said the baby "was not breathing."[2] Shivers woke up Lester and Penny. When Lester and Penny entered the room, they saw Tibbits attempting to perform CPR[3] on A.T. Penny said A.T. had signs of "labored" breathing. Penny saw a bruise near the baby's right eye. Lester also saw a bruise near the baby's left eye. Lester called 911.

When medics arrived, the baby was breathing unevenly and at an accelerated rate. A.T.'s pulse was approximately 200 beats per minute indicating the baby was in shock. According to the medic, Tibbits was "[v]ery calm, . . . not like you would expect a

---

[1] We refer to Lester and Penny Tibbits by their first names for purposes of clarity.

[2] Formatting omitted.

[3] Cardiopulmonary resuscitation.

2

parent to be when their kid is in very dire need of care." Unsolicited, Tibbits immediately explained the bruises by saying the baby was "hitting [its] head on his necklace while . . . laying on his chest." An ambulance took A.T. to the hospital.

On the way to the hospital, medics noted old and new bruising and swelling on multiple areas of the baby's body including the scalp, face, left eye, lips, upper back and shoulders, left thigh, knees, left ankle, and left heel. At the hospital, the nurses and doctors also saw bruising on the baby's buttocks, and the baby's "mucous membranes were very dry and tacky" indicating "a child that's dehydrated and not been fed properly."

X-rays showed three rib fractures that were "at least several days old", "multiple fractures of [the] distal femur and . . . proximal tibia . . . at least several days old", and "a fracture of the back of [the] skull." CAT[4] scans showed "bilateral subdural hematomas", "bleeding around the brain", and "brain swelling." Laboratory tests showed A.T. suffered from malnutrition and vitamin D deficiency.

The medics contacted law enforcement. Tibbits and Shivers agreed to give recorded statements to Mason County Sheriff Detective William Adam. Tibbits gave his statement first. Tibbits admitted he was alone with A.T. when the baby "kinda stopped breathing."[5] Shivers told Detective Adam she left A.T. alone with Tibbits while she went to the bathroom and when she returned, Tibbits told her A.T. "wasn't breathing."[6]

The State charged Tibbits and Shivers with assault of a child in the first degree in violation of RCW 9A.36.120 and criminal mistreatment of a child in the second degree in

---

[4] Computed axial tomography.
[5] Formatting omitted.
[6] Formatting omitted.

3

violation of RCW 9A.42.030.

## COUNT I:

In the County of Mason, State of Washington, on or about the 28th day of APRIL, 2014, the above-named defendants, CHAD ALLEN LESTER TIBBITS and KATARINA M. SHIVERS, did commit ASSAULT OF A CHILD IN THE FIRST DEGREE, a Class A Felony, in that said defendant, being at least eighteen (18) years of age or older, with intent to inflict great bodily harm, did assault a child, to wit: [A.T.] 02/22/14, who at the time of the assault was under the age of thirteen (13) years, and did inflict great bodily harm; and/or being at least eighteen (18) years of age or older did intentionally assault a child, to wit: [A.T.] 02/22/14, who at the time of the assault was under the age of thirteen (13) years, and did recklessly inflict great bodily harm; and/or being at least eighteen (18) years of age or older, did intentionally assault a child, to wit: [A.T.] 02/22/14, who at the time of the assault was under the age of thirteen (13) years, and did cause substantial bodily harm, having previously engaged in a pattern or practice of (A) assaulting the child which has resulted in bodily harm that is greater than transient physical pain or minor temporary marks, or (B) causing the child physical pain or agony that is equivalent to that produced by torture; contrary to RCW 9A.36.120(1) (a) and (b) and RCW 9A.36.011(1) (c) and against the peace and dignity of the State of Washington.

. . . .

## COUNT II:

In the County of Mason, State of Washington, on or about the 22nd day of February, 2014 to the 28th day of APRIL, 2014, the above-named defendants, CHAD ALLEN LESTER TIBBITS and KATARINA M. SHIVERS, did commit CRIMINAL MISTREATMENT IN THE SECOND DEGREE, a Class C Felony, in that said defendant, a parent of a child under the age of eighteen (18), to wit: [A.T.] 02/22/14, acting recklessly, did create an imminent and substantial risk of death or great bodily harm and/or did cause substantial bodily harm to said child or dependent person by withholding any of the basic necessities of life, to wit: food, water, shelter, clothing, and/or medically necessary health care, including but not limited to health-related treatment or activities, hygiene, oxygen, and medication; contrary to RCW 9A.42.030(1) and against the peace and dignity of the State of Washington.

The State alleged the aggravating factors of manifest deliberate cruelty, a particularly vulnerable victim, and the use of a position of trust to facilitate the commission of the

crimes in violation of RCW 9.94A.535(3)(a), (b), and (n).

Several witnesses testified at trial including Lester, Penny, McClure, Rouska, the medics who responded to the 911 call, a doctor who cared for A.T. at the hospital, and child abuse expert Dr. Kenneth Feldman. Without objection, the court admitted into evidence and played the audio and video recordings of the statements that Tibbits and Shivers agreed to give to Detective Adam. Tibbits was the only witness to testify on behalf of the defense. Shivers did not testify.

The jury found Shivers guilty of criminal mistreatment in the second degree and returned a special verdict for the three aggravating factors. The jury found Tibbits guilty of assault in the first degree and criminal mistreatment in the second degree and returned a special verdict for the three aggravating factors. The court determined Tibbits's standard sentence range with enhancements for the aggravating factors to be 102 months to life for the assault conviction and 12 to 60 months for the criminal mistreatment conviction. The court sentenced Tibbits to 420 months for the assault conviction and 60 months for the criminal mistreatment conviction to be served concurrently.

## ANALYSIS

### Sufficiency of the Evidence

Tibbits contends sufficient evidence does not support the jury finding him guilty of assault in the first degree or criminal mistreatment in the second degree. Tibbits also claims sufficient evidence does not support the alternative means of committing assault in the first degree. Specifically, intent to inflict great bodily harm or that he engaged in a pattern or practice of abuse.

5

The State has the burden of proving each element of a crime beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); State v. Borrero, 147 Wn.2d 353, 364, 58 P.3d 245 (2002). Sufficient evidence supports a conviction if when viewed in the light most favorable to the jury verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Witherspoon, 180 Wn.2d 875, 883, 329 P.3d 888 (2014); State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A claim of insufficiency of the evidence admits the truth of the evidence. Witherspoon, 180 Wn.2d at 883. All reasonable inferences must be drawn in favor of the verdict and "interpreted most strongly against the defendant." Salinas, 119 Wn.2d at 201. Circumstantial evidence and direct evidence are equally reliable. State v. Kintz, 169 Wn.2d 537, 551, 238 P.3d 470 (2010); State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We defer to the jury " 'on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence.' " State v. Andy, 182 Wn.2d 294, 303, 340 P.3d 840 (2014) (quoting State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004)).

Under the Washington State Constitution, criminal defendants have a right to a unanimous jury verdict. CONST. art. 1, § 21; State v. Ortega-Martinez, 124 Wn.2d 702, 707, 881 P.2d 231 (1994). But unanimity is not required where sufficient evidence supports each of the alternative means of committing the crime. Ortega-Martinez, 124 Wn.2d at 707-08.

Viewing the evidence in the light most favorable to the State, a jury could find beyond a reasonable doubt Tibbits committed assault in the first degree. On April 28, 2014, A.T. suffered a head injury and stopped breathing while Tibbits was taking care of

6

the baby. In his statement to Detective Adam, Tibbits admitted he was alone with A.T. when the baby stopped breathing. Contrary to Tibbits's explanation to the medics that the baby's head hit his necklace, Dr. Feldman testified a baby "of [A.T.'s] age and apparent condition" would not "be able to generate sufficient force" to injure oneself.

Tibbits claims the evidence is consistent with a "hypothesis of his innocence" because Shivers could have inflicted the head injury to A.T. before going to the bathroom. But even if the evidence supports both an innocent and a criminal explanation, the jury is entitled to infer guilt. State v. Montgomery, 163 Wn.2d 577, 587, 183 P.3d 267 (2008). Tibbits also cites Dr. Feldman's testimony that the head injury would have affected A.T.'s breathing within "two minutes" to argue Shivers could have injured A.T. But contrary to Tibbits's assertion, Dr. Feldman testified a head injury would affect A.T.'s breathing within "seconds, at most," not minutes. Dr. Feldman testified the head injury A.T. suffered would have been so severe that it would have been "readily apparent to anyone in the room."

The evidence supports the jury finding Tibbits assaulted A.T. with the intent to inflict great bodily harm and that he engaged in a pattern or practice of assaulting A.T. or caused physical pain or agony equivalent to that produced by torture.

Viewing the evidence and all reasonable inferences in the light most favorable to the State, the evidence supports the alternative means of assault. Tibbits was alone with A.T. when the baby suffered the head injury that caused A.T. to stop breathing. Dr. Feldman testified A.T.'s head injury was severe enough to cause "brain swelling" and "bleeding around the brain." Dr. Feldman testified the x-rays and CAT scans showed A.T.'s skull had "at least three sites of bleeding." Dr. Feldman testified, "Either the head

was struck by something or struck hard against something." A.T. suffered numerous bruises and fractures prior to April 28 that were in various stages of healing.

Dr. Feldman testified the bruises were "likely the result of direct impacts" from "multiple blows coming in from different directions." Dr. Feldman stated the baby's right femur had "been broken in the past" and likely resulted from "a bending force." Dr. Feldman testified it "takes a pretty good deal of force" to break an infant's femur and a person would feel the "vibration of the snap" and hear the snap of the bone. Dr. Feldman testified the baby's rib fractures likely resulted from "[g]rabbing the kid around the chest and squeezing it hard enough to snap the ribs." Dr. Feldman testified several different "events" over time caused A.T.'s injuries.

> I can't imagine a single event that could cause that many surfaces to have bruises and that many fractures to be present, so we're probably talking about multiple additional events.

Sufficient evidence supports the alternative means of committing the crime of assault in the first degree and the jury verdict.

Tibbits also contends sufficient evidence does not support the jury conviction of criminal mistreatment in the second degree. We disagree.

To convict Tibbits of criminal mistreatment of a child in the second degree, the State must prove beyond a reasonable doubt that Tibbits (1) created an imminent and substantial risk of death or great bodily harm for A.T. or (2) caused substantial bodily harm by withholding from A.T. the basic necessities of life. RCW 9A.42.030(1).

Viewing the evidence in the light most favorable to the State, a jury could find beyond a reasonable doubt that Tibbits committed the crime of criminal mistreatment in

the second degree by recklessly withholding necessary medical aid causing A.T. imminent and substantial risk of death and great bodily harm.

X-rays showed A.T. had multiple rib fractures that were "already well along healing, probably at least ten [days] and likely a little bit older than that." A.T.'s leg fractures were several days old. X-rays showed A.T.'s right femur had previously been broken at least "ten days, two weeks" prior to April 28 and "was healing and had been recently re-fractured." The bruises covering A.T.'s body were also many different colors and shades indicating they were in various states of healing.

The evidence also shows A.T. was severely malnourished. Dr. Feldman testified A.T. "had biochemical evidence of rickets, of having low vitamin D and developing bone disease because of it." Dr. Feldman also testified that if A.T.'s "lack of nutrition" had continued, it could create a high probability of death.

Confrontation Clause

Tibbits argues the admission of the codefendant's recorded statement violated his constitutional right to confront her. We review alleged violations of the confrontation clause de novo. Lilly v. Virginia, 527 U.S. 116, 137, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999); State v. Fisher, 185 Wn.2d 836, 841, 374 P.3d 1185 (2016). When a violation has occurred, we review for harmless error. Chapman v. California, 386 U.S. 18, 21-22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); State v. Jasper, 174 Wn.2d 96, 108, 271 P.3d 876 (2012). An error is harmless if we are persuaded beyond a reasonable doubt the jury would have reached the same result in the absence of the error. Fisher, 185 Wn.2d at 847.

Tibbits contends the court violated his right to confrontation by admitting Shivers's out-of-court statement that she left A.T. alone with him when the baby stopped breathing. Tibbits did not object to the admission of the recorded statements he and Shivers gave to Detective Adam. In the recorded statement, Shivers states:

> I had to go to the bathroom . . . [s]o I took [A.T.] out and I just I didn't, I usually sometimes I'll (inaudible) have to go to the bathroom (inaudible) stand up. And then I took [A.T.], I took the buckles off and then [A.T.]'d already woken up and I had to go to the bathroom so I handed [A.T.] to [Tibbits], he was sitting in the rocking chair[,] . . . [a]nd went to the bathroom. . . . When I came back [A.T.] wasn't . . . he handed [A.T.] to me and told me that [A.T.] wasn't breathing.[7]

Further, even if error, the statement was harmless beyond a reasonable doubt. The court instructed the jury not to consider Shivers's statement as evidence against Tibbits. Jury instruction 7 states:

> You may consider a statement made out of court by one defendant as evidence against that defendant, but not as evidence against another defendant.

We presume jurors follow their instructions. State v. Russell, 125 Wn.2d 24, 84, 882 P.2d 747 (1994).

In addition, Tibbits's statement to Detective Adam was identical to Shivers's statement. Tibbits gave a recorded statement to Detective Adam before Shivers. Tibbits told Detective Adam he was alone with A.T. when Shivers went to the bathroom and when she returned, the baby was not breathing. In the recorded statement, Tibbits states:

> I was sitting in the chair . . . holding [A.T.] against me so [A.T.] couldn't bang [A.T.'s] head on me like [A.T.] usually does. And I was just patting on [A.T.'s] butt and kinda rocking slowly. And uh then about the time [A.T.'s] mom started walking back in the bathroom [A.T.] started screaming real loud again and (inaudible) mom left cause she had to go to

---

[7] Formatting omitted.

10

the bathroom real bad. So I took [A.T.] down I just kinda moved [A.T.] like this and just held [A.T.], holding [A.T.] like this for . . . mom to come and get [A.T.] to feed [A.T.] again. Then that's when [A.T.] kinda stopped breathing and having a hard time.[8]

Because the court instructed the jury not to consider any of Shivers's statements as evidence against Tibbits and the statement she made about what happened was identical to the statement Tibbits made, the jury would have reached the same conclusion in the absence of the admission of Shivers's statement.

Prosecutorial Misconduct

Tibbits contends prosecutorial misconduct during rebuttal deprived him of his right to a fair trial. To prevail on a claim of prosecutorial misconduct, a defendant must show the prosecutor's argument was improper and prejudicial. State v. Warren, 165 Wn.2d 17, 26, 195 P.3d 940 (2008). We review allegations of prosecutorial misconduct for abuse of discretion. State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014). If the defendant fails to object, he waives the issue of misconduct unless the comments are so flagrant and ill-intentioned that an instruction could not have cured any resulting prejudice. State v. Thorgerson, 172 Wn.2d 438, 443, 258 P.3d 43 (2011).

In rebuttal, a prosecutor is entitled to make a fair response to the arguments of defense counsel. State v. Brown, 132 Wn.2d 529, 566, 940 P.2d 546 (1997). Unless the remarks are not a pertinent reply or are so prejudicial that a jury instruction would be ineffective, improper remarks by the prosecutor are not grounds for reversal if they are invited or provoked by defense counsel and are in reply to defense counsel's statements. Russell, 125 Wn.2d at 86.

---

[8] Formatting omitted.

Tibbits contends the prosecutor appealed to the passion and prejudice of the jury. A prosecutor may not make improper comments designed to appeal to the passion and prejudice of the jury or encourage a verdict based on emotion rather than evidence. In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). In rebuttal, the prosecutor stated, "Some of us have shed tears over this case. Many of you have or maybe will." But following his remark, the prosecutor reiterated the jury should base it decision on the evidence.

> Now, I am not asking you to convict Chad Tibbits because he didn't know. I'm not asking you to convict Chad Tibbits because he's a man or he's a father or because of anything to do with any kingdom or household. The evidence is what leads you to that conclusion, to that conviction. The evidence is what leads you - should lead you to that conclusion when it comes to [Shivers] as well.

Tibbits did not object. The prosecutor's remarks were not so flagrant and ill-intentioned that the court could not have cured any prejudice with an instruction.

State v. Reed, 102 Wn.2d 140, 684 P.2d 699 (1984), is distinguishable. In Reed, the prosecutor appealed to the "hometown instincts" of the jury by asking the jurors to ignore the evidence because it was presented by " 'city lawyers' " and " 'city doctors.' " Reed, 102 Wn.2d at 147, 143.[9] Here, the prosecutor did not ask the jury to ignore the evidence.

Tibbits argues the prosecutor disparaged his defense attorney in rebuttal by pointing out a misstatement made by the attorney in closing argument. In closing, the defense attorney argued:

> And what does [Tibbits] do? Does he not do anything? No. He responds appropriate for a man, for a father who has just discovered his sixty-two-year-old baby daughter, [A.T.], not breathing. He screams for help. He begins CPR. He hands the baby off to the mother, to his

---

[9] Emphasis omitted.

mother.

. . . .

> So, the prosecutor wants you to not only assume that my client's such a monster, but the parents themselves are such monsters as grandparents that if they saw their baby granddaughter, <u>sixty-two years old</u>, bruised and injured, that they didn't call authorities either.[10]

In rebuttal, the prosecutor referred to the misstatement Tibbets's attorney made about the age of A.T. Tibbits did not object. The prosecutor argued, in pertinent part:

> Now, I'm - forgive me for being nitpicky if I am. I know that sometimes we make mistakes when we speak. I'm sure that I do it as well. [Defense counsel] referred to [A.T.] as a <u>sixty-two-year-old baby</u>, and we know what he meant, okay. I don't - that happens. But it's interesting to me when we talk about there being four people in that home, because there were five. And when we talk about two of them not having jobs, when there were actually four of them that didn't have jobs, but one of the people and one of the - specifically one of the people without a job was [A.T.], and she a little tiny little baby.
> Was it an innocent slip of the tongue, or does it reveal something more about why, at every turn, [Tibbets]'s give a damn seems to be broken when he referred to doing CPR on his [child] just like how you would on a human person.[11]

Here, the prosecutor's rebuttal did not impugn the role or integrity of defense counsel. And the comment was not so flagrant and ill-intentioned that the court could not have cured any prejudice with an instruction.

Ineffective Assistance of Counsel

Tibbits contends his attorney provided ineffective assistance of counsel. We review claims of ineffective assistance of counsel de novo. <u>State v. A.N.J.</u>, 168 Wn.2d 91, 109, 225 P.3d 956 (2010). The Sixth Amendment to the United States Constitution guarantees the right to effective assistance of counsel to a criminal defendant. <u>Strickland v. Washington</u>, 466 U.S. 668, 684, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To demonstrate ineffective assistance of counsel, a defendant must show (1) counsel's

---

[10] Emphasis added.
[11] Emphasis added.

representation was deficient, it fell below an objective standard of reasonableness; and (2) prejudice. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Legitimate trial strategy cannot serve as a basis for a claim of ineffective assistance of counsel. State v. Aho, 137 Wn.2d 736, 745-46, 975 P.2d 512 (1999). We presume the defendant was properly represented and performance was not deficient. State v. Lord, 117 Wn.2d 829, 883, 822 P.2d 177 (1991). Prejudice results when there is a reasonable probability that the result of the trial would have been different. State v. Thomas, 109 Wn.2d 222, 226, 743 P.2d 816 (1987). If either prong of the test is not satisfied, the inquiry need go no further. State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

Tibbits claims his attorney provided ineffective assistance of counsel by failing to file a motion to sever his trial from the codefendant's trial. A defendant seeking severance must demonstrate a joint trial would be so manifestly prejudicial as to outweigh the concern for judicial economy. State v. Sublett, 176 Wn.2d 58, 68-69, 292 P.3d 715 (2012). On appeal, a defendant must point to specific prejudice. Sublett, 176 Wn.2d at 69. Mutually antagonistic defenses may be sufficient to support a motion to sever, but this is a factual question that must be proved and is not sufficient grounds in itself as a matter of law. Sublett, 176 Wn.2d at 69 (citing State v. Grisby, 97 Wn.2d 493, 508, 647 P.2d 6 (1982)). "The conflict must be so prejudicial that the two defenses are irreconcilable, such that the jury will unjustifiably infer that the conflict alone demonstrates that both defendants are guilty." Sublett, 176 Wn.2d at 69 (citing State v. Hoffman, 116 Wn.2d 51, 74, 804 P.2d 577 (1991)).

Tibbits cannot show ineffective assistance of counsel for failing to file a motion to sever. Although there were antagonistic defenses between Tibbits and Shivers, the conflict was not so prejudicial that the jury would have unjustifiably inferred the conflict alone demonstrates guilt.

Tibbits also contends his attorney provided ineffective assistance of counsel by failing to object to a question Shivers's attorney asked Mason County Sheriff Sergeant Jason Dracobly. The attorney asked Sergeant Dracobly if it is uncommon for a victim of domestic violence to cover up for an abuser. The prosecutor objected to the question.

> Q.     Let me ask something more specific. Is it uncommon for a victim of domestic violence to cover up for her abuser?
> [PROSECUTOR]:     Your Honor, I'm going to <u>object</u> to the relevance.
> THE COURT:     <u>Sustained</u> as to foundation.
> Q.     Is it uncommon for a <u>domestic violence</u> abuser to isolate their victim?
> [PROSECUTOR]:     Your Honor, same <u>objection</u> —
> THE COURT:     Can I have counsel —
> [PROSECUTOR]:     — to relevance.
> THE COURT:     Can I have counsel approach please? Mute me.
>                                     Sidebar conference off the record.
> THE COURT:     Continue.
> [SHIVERS'S ATTORNEY]:     I have <u>nothing further</u> at this time.[12]

Because the prosecutor immediately objected to the question and the court sustained the objection, Tibbits cannot show ineffective assistance of counsel.

Tibbits argues his attorney should have objected when Shivers's attorney asked if there were reasons his parents would lie to the jury.

> [SHIVERS'S ATTORNEY].     So, you never changed [A.T.]?
> [TIBBITS].  No.
> Q.          Not once?
> A.          No.
> Q.          Okay. Is there a reason that your mother would lie to the jury when she testified that you did?

---

12 Emphasis added.

15

A.        I don't know what my mom would say or why she would lie.

Q.        Is there a reason that your father would lie when he testified to the jury that you did?

A.        Again, I don't know why.

Tibbits also argues his attorney should have objected when the prosecutor asked Tibbits if his parents were lying to protect him.

Q.        To the extent that your mother and father weren't telling the truth, they were protecting you, weren't they, not [Shivers]?

A.        I don't have no idea which person my mom and dad are protecting.

Even if improper, Tibbits cannot show there is a reasonable probability the failure to object had any effect on the outcome of the trial.

Tibbits contends his attorney should have objected to the prosecutor's remark in rebuttal that "[s]ome of us have shed tears over this case. Many of you have or maybe will." Tibbits also argues his attorney should have objected to the reference to the misstatement that A.T. was a "sixty-two-year-old baby."

Tibbits cannot show prejudice. The court instructed the jury to base its decisions on the evidence and not on statements made by the prosecutor.[13] We presume jurors will follow the court's instruction. Russell, 125 Wn.2d at 84.

Sentencing

Tibbits contends the court erred in making a finding that increases the mandatory minimum sentence for assault of a child in the first degree. In the judgment and sentence, the court made the following finding:

> In Count I, assault in the 1st degree (RCW 9A.36.011) or assault of a child in the 1st degree (RCW 9A.36.120), the offender used force or means

---

[13] Jury instruction 1 states, in pertinent part:

A lawyer's remarks, statements and arguments are intended to help you understand the evidence and apply the law. It is important, however, for you to remember that the lawyers' statements are not evidence. The evidence is the testimony and the exhibits.

likely to result in death or intended to kill the victim and shall be subject to a mandatory minimum term of 5 years (RCW 9.94A.540).

The State concedes the finding violates Tibbits's right to a jury determination.

We accept the concession as well taken. In <u>Alleyne v. United States</u>, __ U.S. __, 133 S. Ct. 2151, 2153-54, 186 L. Ed. 2d 314 (2013), the Court held that any fact that increases the mandatory minimum is an "element" that must be submitted to the jury.

We affirm the jury convictions and remand for resentencing.[14]

WE CONCUR:

---

[14] The State does not seek costs on appeal.

17