IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 78231-2-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| HAROLD JOHN MURPHY, | ) | |
| | ) | |
| Appellant. | ) | |

BOWMAN, J. — Harold John Murphy raises several issues on appeal of his multiple convictions stemming from a bank fraud scheme. We conclude Murphy's claims have no merit, and affirm.

FACTS

The State charged Murphy with one count of attempted theft in the first degree and one count of assault in the second degree with firearm enhancements for each. The State also charged Murphy with unlawful possession of a firearm (UPFA) in the first degree. By amended information, the State added three counts of attempted theft in the first degree. The charges stemmed from a "bank lick"[1] operation; a bank fraud scheme involving deposits of worthless checks into an account and withdrawals from the account of

---

[1] Also known as "bank liq" or "bank liquidation."

Citations and pin cites are based on the Westlaw online version of the cited material.

provisional funds before the bank discovers the deception. Murphy attempted to perpetrate three sets of bank licks targeting Boeing Employees Credit Union (BECU).

In June 2016, Murphy met Samantha Tinoco and her friend Taya Sneed and recruited them to work for him. Murphy told Sneed he wanted to hire her to promote him as a rapper. Tinoco thought she would be working as a model for Murphy's rap videos. Murphy told the women he would pay them in advance but first they needed to deposit checks in their BECU accounts because his account was "full."

Sneed testified Murphy told her that "they weren't able to get their money, so they put those checks in our name so that we could get it for them, and were also saying that it's going to, like, turn into ours." Tinoco and Sneed also gave Murphy their debit cards and PINs.[2] Murphy claimed he needed the debit cards "because he was doing a show" in Portland, Oregon.

Murphy and a friend showed the women an "envelope full of" checks. The checks were from businesses like Seattle City Light and Aerotek and made payable to Tinoco and Sneed. Murphy drove the women to several BECU branches to deposit the checks and withdraw the cash for him. While in Murphy's car, both Sneed and Tinoco saw a gun in the glove compartment. When Sneed asked about the gun, Murphy said he "[o]nly uses it when he needs it."

---

[2] Personal identification numbers.

Between June 10 and 13, Tinoco deposited four checks, immediately withdrew the cash, and gave it to Murphy. Sneed attempted to deposit checks on three occasions. On the third attempt, the teller refused the transaction because too much money had gone through Sneed's account. Later that day, Sneed and Tinoco spoke with a friend who alerted them to the fraudulent scheme. Sneed and Tinoco went to BECU to report the fraud on June 13. By that time, Sneed had deposited and withdrawn almost $5,000 for Murphy. Tinoco had deposited and withdrawn nearly $9,800.

Celeste Barker-Henry testified about her role in a similar incident around the same time. Barker-Henry was experiencing financial troubles and Murphy and his friend told her they could help. They sat in Murphy's car in a parking lot and Murphy offered to write her a check for the money she needed. Barker-Henry gave Murphy her debit card and PIN. While she was in Murphy's car, Barker-Henry saw a gun in the center console.

The next day on June 15, Murphy gave Barker-Henry a check from Swedish Hospital made payable to her. He told her to deposit the check in her BECU account. Murphy explained that he would withdraw some of the money and leave the amount she needed in her account. When Barker-Henry attempted to deposit the check, the teller informed her the check was "fake." A bank security employee told Barker-Henry to return the next day to discuss the incident. When Barker-Henry left BECU approximately 20 minutes after she entered the bank, Murphy was gone.

Barker-Henry returned to BECU the next day as instructed. The BECU fraud investigator showed her evidence that Murphy had used her debit card to deposit a fraudulent check at an ATM[3] and withdraw cash. A month later, Barker-Henry met with King County Sheriff's Detective Robin Fry and identified Murphy from a photomontage.

Murphy's younger cousin Rolazja Stewart-Satterwhite also testified about her involvement in his scheme. On June 30, Stewart-Satterwhite and her cousin Alysha Stevens[4] met Murphy, who told Stewart-Satterwhite she needed to go into a bank to deposit a check for him. Stewart-Satterwhite refused, but Murphy took a gun from the glove compartment of his car and pressed the barrel into her side. At that point, Stewart-Satterwhite agreed. At Murphy's direction, Stevens then drove Stewart-Satterwhite to a BECU branch in his car.

Initially, Stewart-Satterwhite attempted to deposit the check at the drive-through teller. The teller told them the large amount of the check required deposit inside the bank. Stewart-Satterwhite texted this information to Murphy, who told her to "remain calm" and delete their messages. When Stewart-Satterwhite and Stevens went into the bank, they were escorted into an office to speak with two BECU employees, including financial crime investigator Trichell Avaava. Eventually, Stewart-Satterwhite explained the situation.

Stewart-Satterwhite was worried about returning to Murphy without the cash. In response, Avaava enacted a plan. Avaava wrote Stewart-Satterwhite a

---

[3] Automated teller machine.

[4] Stevens and Murphy are not related.

4

false receipt that showed the deposit was pending in her account and would be available after the upcoming July 4 holiday. Stewart-Satterwhite showed the receipt to Murphy and told him that BECU wanted her to go into the branch after July 4 to sign for the large amount of money. Murphy told Stewart-Satterwhite to comply.

On July 7, the day the money was supposed to be available, Stewart-Satterwhite was with Detective Fry and exchanged messages with Murphy. When Murphy met Stewart-Satterwhite to pick up his money, officers arrested him.

The State charged Murphy with one count of attempted theft in the first degree and assault in the second degree with firearm enhancements related to the incident involving Stewart-Satterwhite. The State charged him with three additional counts of attempted theft in the first degree stemming from the activities with Tinoco, Sneed, and Barker-Henry. Due to his criminal history, the State also charged Murphy with UPFA in the first degree. A jury convicted Murphy as charged. With an offender score of 10, the court imposed a concurrent high-end standard-range sentence of 170 months of confinement.

ANALYSIS

<u>Severance</u>

Murphy argues the trial court erred when it denied his motion to sever the UPFA charge from the other five charged crimes. The State contends Murphy waived his right to appeal this issue and failed to demonstrate specific prejudice

requiring separate trials.  We conclude that Murphy did not waive his right to challenge the court's ruling and the court did not err in denying his motion.

Waiver

The State claims Murphy waived his right to challenge severance "because he did not renew [the motion to sever] before or at the close of the evidence."  Under CrR 4.4(a)(1),

> [a] defendant's motion for severance of offenses . . . must be made before trial, except that a motion for severance may be made before or at the close of all the evidence if the interests of justice require.  Severance is waived if the motion is not made at the appropriate time.

If the trial court denies a pretrial severance motion, the defendant may renew the motion before or at the close of evidence.  CrR 4.4(a)(2).  Failure to renew the pretrial motion results in waiver.  CrR 4.4(a)(2).

Here, Murphy did not make a pretrial motion to sever.  He made his motion to sever the UPFA charge during jury selection.  A motion to sever made on the morning of the trial is not a motion made "before trial" under CrR 4.4(a)(1). State v. Hernandez, 58 Wn. App. 793, 797, 794 P.2d 1327 (1990); State v. Harris, 36 Wn. App. 746, 748-49, 677 P.2d 202 (1984).  Because Murphy moved for severance at trial, he did not need to renew his motion to prevent waiver.

Prejudice

We review a trial court's refusal to sever counts for manifest abuse of discretion.  State v. Bythrow, 114 Wn.2d 713, 718, 790 P.2d 154 (1990).  "To show that the trial court abused its discretion in denying severance, 'the

defendant must be able to point to specific prejudice.' " State v. Huynh, 175 Wn. App. 896, 908, 307 P.3d 788 (2013) (quoting Bythrow, 114 Wn.2d at 720).

" 'Severance' refers to dividing joined offenses into separate charging documents." State v. Bluford, 188 Wn.2d 298, 306, 393 P.3d 1219 (2017); see CrR 4.4(b). On a motion by either party, the court may sever offenses if it "determines that severance will promote a fair determination of the defendant's guilt or innocence of each offense." CrR 4.4(b); Bluford, 188 Wn.2d at 306.

Washington disfavors separate trials. State v. Medina, 112 Wn. App. 40, 52, 48 P.3d 1005 (2002). "Defendants seeking severance have the burden of demonstrating that a trial involving both counts would be so manifestly prejudicial as to outweigh the concern for judicial economy." Bythrow, 114 Wn.2d at 718. In assessing whether severance is appropriate, the trial court considers

> (1) the strength of the State's evidence on each count; (2) the clarity of defenses as to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of evidence of the other charges even if not joined for trial.

State v. Russell, 125 Wn.2d 24, 63, 882 P.2d 747 (1994).

Here, the factors support the trial court's decision. The State had compelling evidence on each of the counts. Each of the women Murphy induced to participate in the fraud testified about Murphy's orchestration of the schemes and that he kept a firearm in his vehicle. Stewart-Satterwhite testified in detail about Murphy forcing her to participate in the fraud at gunpoint. Murphy employed a "general denial" defense for all charges. And, as the trial court noted, the "vast majority" of the evidence was cross admissible.

Murphy contends that evidence of his prior felony conviction in support of the UPFA charge was not cross admissible and resulted in undue prejudice. However, even where evidence of one count would not be admissible in a separate trial on the other counts, severance is not necessarily required. See Bythrow, 114 Wn.2d at 720. The defendant must "point to specific prejudice." Bythrow, 114 Wn.2d at 720 (citing State v. Grisby, 97 Wn.2d 493, 507, 647 P.2d 6 (1982)).

Murphy fails to point to specific prejudice. The parties stipulated to identifying Murphy's prior conviction as a "generic" "serious offense," eliminating the potential prejudice from introduction of the specifics of his prior conviction. The trial court also explicitly instructed the jury to use the evidence of the prior conviction solely for the limited purpose of the UPFA charge and not "for any other purpose." Finally, the trial court instructed the jury to "decide each count separately" and that their verdict on one count "should not control" their verdict "on any other count." We presume the jury follows the court's instructions. State v. Emery, 174 Wn.2d 741, 754, 278 P.3d 653 (2012).

Murphy fails to demonstrate that he was manifestly prejudiced by the trial court's failure to sever his UPFA charge from the other charges. The trial court did not abuse its discretion.[5]

---

[5] Murphy also claims the trial court erred in failing to bifurcate the UPFA charge. We review a trial court's decision on bifurcation for abuse of discretion. State v. Roswell, 165 Wn.2d 186, 192, 196 P.3d 705 (2008). Because Murphy is unable to show prejudice, the court did not abuse its discretion.

Prosecutorial Misconduct

Murphy claims the prosecutor committed misconduct by improperly commenting on his constitutional right to remain silent. According to Murphy, the prosecutor emphasized that he invoked his right to silence and contrasted his silence with the cooperating witnesses who spoke freely with the police. We disagree.

To establish prosecutorial misconduct, a defendant must demonstrate that the conduct was both improper and prejudicial in the context of the entirety of the record and the circumstances at trial. State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008). Where, as here, the defendant fails to object at trial, he waives the error absent misconduct so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. Emery, 174 Wn.2d at 760-61. To demonstrate this level of misconduct, the defendant must show "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.' " Emery, 174 Wn.2d at 761 (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

A defendant's exercise of his Fifth Amendment right to silence may not be introduced at trial as substantive evidence of guilt. U.S. CONST. amend V; State v. Gauthier, 174 Wn. App. 257, 264, 298 P.3d 126 (2013). "A comment on an accused's silence occurs when [the invocation is] used to the State's advantage either as substantive evidence of guilt or to suggest to the jury that the silence

9

was an admission of guilt." State v. Lewis, 130 Wn.2d 700, 707, 927 P.2d 235 (1996).

Detective Fry testified that she advised Murphy of his constitutional rights using a standardized "Explanation of My Constitutional Rights" form that she read aloud as Murphy followed along. The form includes the right to remain silent. Murphy acknowledged that he understood his rights and signed the form. Detective Fry then read Murphy the waiver of constitutional rights section of the form. The waiver section states:

> "I have read the above explanation of my constitutional rights, and I understand them. I have decided not to exercise these rights at this time. The following statement is made by me freely and voluntarily, without threats or promise of any kind."

Murphy then "provided some details" of the incidents.[6] Detective Fry asked Murphy if "he wanted me to document that, that it could be recorded or taped." Murphy declined. Detective Fry testified that Murphy did not provide additional details.

Murphy contends the prosecutor contrasted his choice not to give additional details with the choice of other witnesses to talk freely with the police. Murphy misconstrues the evidence. Of the witnesses, only Stewart-Satterwhite was advised of her Miranda[7] warnings. At the time, she was a suspect in criminal activity. Detective Fry testified she advised Stewart-Satterwhite of her constitutional rights and she waived those rights and agreed to speak to

---

[6] Murphy stated Stewart-Satterwhite was "a friend" and insisted he was not involved in the deposit with BECU and did not have a gun.

[7] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Detective Fry. The record does not show that Sneed, Tinoco, or Barker-Henry ever received Miranda warnings. There is no support for Murphy's claim that the prosecutor's use of the statements from any of these witnesses inherently emphasized Murphy's decision not to elaborate on his statement.

Furthermore, neither Detective Fry nor the prosecutor emphasized Murphy's choice not to give further details or have his statement recorded. Detective Fry described her interaction with Murphy and his answers to her questions. She also explained that he declined to have his statement recorded and did not provide further details. There was no attempt to use the evidence to imply consciousness of guilt. Murphy's claim of prosecutorial misconduct fails.

Ineffective Assistance of Counsel

Murphy raises several grounds for ineffective assistance of counsel, all stemming from defense counsel's failure to raise various objections. To prove ineffective assistance of counsel based on failure to object, a defendant must show that not objecting "fell below prevailing professional norms, that the proposed objection would likely have been sustained, and that the result of the trial would have been different if the evidence had not been admitted." In re Pers. Restraint Petition of Davis, 152 Wn.2d 647, 714, 101 P.3d 1 (2004).[8] Courts engage in a strong presumption of effective representation. State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). For a successful claim of ineffective assistance of counsel, a defendant must establish both objectively deficient performance and resulting prejudice. Emery, 174 Wn.2d at 754-55.

---

[8] Footnotes omitted.

11

Failure To Object to Leading Questions

Murphy claims his counsel failed to object to leading questions by the prosecutor. However, Murphy does not provide specific examples of improper questions. His citations to the record span dozens of pages of the trial transcript. As a result, Murphy's briefing does not satisfy RAP 10.3(a)(6) requiring "references to relevant parts of the record." We decline to search the broad citations to the record for evidence of leading questions. See State v. Brousseau, 172 Wn.2d 331, 353, 259 P.3d 209 (2011).

Failure To Object to Comment on Silence

Murphy also alleges ineffective assistance because his attorney did not object to the prosecutor's alleged comment on his right to remain silent. As discussed above, the prosecutor did not improperly comment on Murphy's silence. No objection was required and counsel was not deficient.

Additional Claims

Murphy makes several allegations of ineffective assistance due to his attorney's failure to object but neglects to include legal analysis as required by RAP 10.3(a)(6). For example, he contends counsel did not object when the prosecutor made statements during closing argument that were inconsistent with the jury instruction about intent and possession of a firearm. However, Murphy provides no analysis of this alleged error. Similarly, Murphy also claims counsel did not object to irrelevant expert testimony but fails to explain why admission of the evidence was erroneous and prejudicial. Because Murphy does not comply with RAP 10.3(a)(6), we decline to address these allegations.

Cumulative Error

Murphy argues the cumulative errors of denying his motion to sever, prosecutorial misconduct, and ineffective assistance of counsel deprived him of his right to a fair trial. Where several errors standing alone do not warrant reversal, the cumulative error doctrine requires reversal when the combined effect of several errors denies the defendant a fair trial. State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). "The doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial." Weber, 159 Wn.2d at 279. Because Murphy has failed to demonstrate any errors, he cannot avail himself of the cumulative error doctrine.

Sufficiency of the Evidence

Murphy argues sufficient evidence does not support his convictions because they rest on "unreliable" witnesses, prejudicial evidence, and violation of his right to remain silent.[9] We conclude sufficient evidence supports the convictions.

"Evidence is sufficient to support a conviction if, after viewing the evidence in a light most favorable to the State, it allows any rational trier of fact to find all of the elements of the crime charged beyond a reasonable doubt." State v. DeVries, 149 Wn.2d 842, 849, 72 P.3d 748 (2003). A challenge to the sufficiency of the evidence admits the truth of the State's evidence and all

---

[9] In his reply brief, Murphy argues for the first time that the State failed to provide evidence sufficient to meet the threshold $5,000 necessary to convict him of attempted theft in the first degree. See RCW 9A.56.030(1)(a). We will not consider issues raised for the first time in the reply brief. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

reasonable inferences therefrom. DeVries, 149 Wn.2d at 849. Review for sufficiency of the evidence is highly deferential to the jury's decision and we do not consider issues of credibility, persuasiveness, and conflicting testimony. State v. Davis, 182 Wn.2d 222, 227, 340 P.3d 820 (2014).

The State presented overwhelming evidence of Murphy's guilt. All the women involved in the incidents testified as to Murphy's role in the bank fraud scheme. As discussed above, they all provided specific evidence of Murphy's orchestration of the deposits and withdrawals of cash from their BECU accounts. All of the women testified that Murphy stored a firearm in his car. Stewart-Satterwhite described the incident in which Murphy obtained the gun from the glove compartment and held it to her side. Additionally, BECU financial crime investigator Avaava testified about her investigation of the bank fraud incidents involving Stewart-Satterwhite, Sneed, Tinoco, and Barker-Henry. Avaava also described and produced documents related to "over-the-counter teller deposits and withdrawals" and debit card ATM transactions, as well as photographs pertaining to the account holders, Murphy, and their bank activities.

Viewing this evidence in a light most favorable to the State, we conclude any rational trier of fact could find all the elements of the charged crimes beyond a reasonable doubt.

Statement of Additional Grounds

Murphy submitted a statement of additional grounds for review. He claims he received ineffective assistance of counsel when his attorney improperly proposed a special jury instruction on the firearm enhancements in count 1,

attempted theft in the first degree; and count 2, assault in the second degree.

Murphy asserts the instruction relieved the State of its burden to prove a nexus

between the firearm and the crime. The jury instruction states:

> For purposes of the special verdicts, the State must prove beyond a reasonable doubt that the defendant was armed with a firearm at the time of the commission of the crimes charged in Count 1 and Count 2.
> For purposes of the special verdicts, a "firearm" is a weapon or device from which a projectile may be fired by an explosive such as gunpowder.

This jury instruction was not erroneous. 11 Washington Practice:

Washington Pattern Jury Instructions: Criminal 2.10.01 (4th ed. 2016) (WPIC)

provides the pattern jury instruction for firearm enhancement special verdicts.

WPIC 2.10.01 states, "For purposes of a special verdict, the State must prove

beyond a reasonable doubt that the defendant was armed with a firearm at the

time of the commission of the crime [in Count __]."[10] The instruction contains a

second paragraph with "nexus" language that states, "The State must prove

beyond a reasonable doubt that there was a connection between the firearm and

the crime." WPIC 2.10.010.[11] The "Note on Use" of this instruction specifies, "Do

not use the second paragraph in a case in which the weapon was actually used

and displayed during the commission of the crime." WPIC 2.10.010.

The firearm enhancements as charged in counts 1 and 2 are based on the

incident in which Murphy held a gun to Stewart-Satterwhite and attempted to

defraud BECU. Because Murphy used a firearm in the commission of the crime,

---

[10] Boldface omitted; alteration in original.

[11] Boldface omitted.

15

the nexus language was not used in the jury instruction. The Washington Supreme Court has held that a special verdict instruction with the same language at issue here properly "informs the jury that it must find a relationship between the defendant, the crime, and the deadly weapon." State v. Willis, 153 Wn.2d 366, 374, 103 P.3d 1213 (2005). We conclude defense counsel was not deficient in proposing the instruction.

We affirm the jury convictions of attempted theft in the first degree and assault in the second degree with firearm enhancements, UPFA in the first degree, and three additional counts of attempted theft in the first degree.

Brennan, J.

WE CONCUR:

Andrus, A.C.J.       Dwyer, J.